MURDUCK et al. v. CITY OF BLACKWELL.

No. 32191. Dec. 23, 1946.

Rehearing Denied Feb. 4, 1947.

*176 P. 2d 1002.*

172

Irving D. Ross, of Newkirk, for plaintiffs in error.

John S. Burger, City Atty., Gurley & Rodgers, and Peyton E. Brown, all of Blackwell, for defendant in error.

RILEY, J. This is an action for damages commenced by plaintiffs in error against the City of Blackwell.

Plaintiffs are the owners of the northwest quarter, sec. 28, twp. 29 north, range 2 west in Kay county. Approximately the north half of the farm is bluff and high prairie land. The south half comprises a basin. Along the south side of the farm, partly on plaintiffs' land and partly on the farm south of it, there is a ridge some six or eight feet high. The ridge extends from the high bluff to the west on plaintiffs' land eastward to a high bluff, forming the basin. It is enclosed by the high bluff on the north and west and the ridge on the south. The basin has no natural drainage. There is but a little area draining into it. Less than one-half mile south of plaintiffs' land the Chickaskia river flows to the east. The river is substantially parallel with the south line of plaintiffs' land. In its natural state, the basin covers about 60 acres. Having no drainage, the basin was a marshy tract of land unfit for cultivation.

In 1908, the then owner constructed a 10-inch tile drainage line 3,065 feet long, from the low point in the basin in a southeasterly direction through the ridge, across the corner of an adjoining farm, onto a farm cornering the plaintiffs' land on the southeast. This farm was known as the Wittman farm. The drainage went into a ravine which ran into the river 10 or 12 feet above the normal water level of the river. The drainage efficiently drained the basin until 1942.

In 1936, defendant commenced the construction of a dam across the river about 1 1/2 miles below plaintiffs' land. The purpose was to form a reservoir whereby the city could obtain an adequate supply of water. The plan called for a dam 20 feet high, the top of which was to be at an elevation 1,023 feet above sea level, with a spillway in the

center about 100 feet wide, .8 feet below the top of the dam, so as to make the water level in the lake, when full, 1,022.2 feet above sea level. Surveys, both by the city engineer and an engineer employed by plaintiffs, showed the elevation at the outlet of plaintiffs' tile drain to be 1,018.89 feet above sea level. It was thus made to appear that after the dam would have been completed and the water had arisen to the top of the dam, the level of the water in the reservoir would be 3.31 feet above the outlet of plaintiffs' drain.

Thereupon the owners of the land above described commenced an action to enjoin the city from constructing the dam to that height. No restraining order or temporary injunction was issued. The city filed demurrer to the petition and, pending action on the demurrer, defendant proceeded with the construction of the dam and completed it about May, 1937.

Plaintiffs' drainage system continued to function apparently as well as before the construction of the dam, until June, 1942, when the river overflowed the ridge and filled the basin on plaintiffs' land. When the flood waters receded, the water entrapped in the basin failed to drain out so that, as claimed by plaintiffs, about 50 acres of plaintiffs' land again became a swamp. In August, 1942, plaintiffs commenced this action to recover for the damages to their land.

Plaintiffs' petition alleged the ownership of the land, its location, and description. Plaintiffs alleged the construction of the drainage line, in 1908, through the ridge and across the Wittman farm, plaintiffs' right and authority to operate and maintain the drainage and its efficiency. Plaintiffs set forth the injunction action, the construction of the dam pending that action, and its dismissal without prejudice less than one year before the commencement of this action. Plaintiffs alleged that when the dam was so constructed, it caused the water to rise in the reservoir above the outlet of the drainage tile so as to choke and clog it and render it impossible for the drainage to function adequately. The flood in 1942, the consequent overflow of plaintiffs' land, the failure of the water to drain out of the basin when the flood waters receded were stated and said to be caused by the failure of the water to drain out when the dam was constructed in that the water backed up above the outlet of the drain. The result was pleaded to be the ruination of 50 acres of plaintiffs' land, to plaintiffs' damage in the sum of $6,500. Plaintiffs prayed judgment in that amount.

Defendant answered by general denial. It pleaded the statute of limitations, in that the injuries claimed by plaintiffs were the natural and obvious result of the construction of the dam and were wholly apparent and obvious immediately upon the construction of the dam; that the dam was completed on or about May 21, 1927 (1937), and that plaintiffs' cause of action, if any, accrued not later than that date, so that more than two years had elapsed before this action was commenced.

The answer further alleged that plaintiffs are estopped from denying that the injuries, if any, were so apparent and obvious at the time the dam was completed, by reason of the allegations made by plaintiffs in their action for an injunction.

Reply was by general and specific denial and again alleging that the injunction case was dismissed without prejudice less than one year prior to the commencement of the present action.

The issues thus joined were tried to a jury and at the close of the evidence the court sustained defendant's demurrer to the evidence, withdrew the case from the jury, and entered judgment for the defendant.

The grounds of defendant's demurrer were: First, that the evidence is insufficient to prove and constitute a cause of action in favor of plaintiffs and against defendant; second, that the evidence shows that the cause of action, if

any the plaintiffs have, is barred by the statute of limitations.

The trial court did not indicate in its order upon which of the two grounds the demurrer was sustained. The court said:

"I have come to the conclusion that there is no allegation or proof to sustain a verdict for the plaintiffs. Therefore I am directing a verdict for defendant."

The language used by the court indicates that the court may have concluded, first, that the allegations of the petition were such as to show that the action was barred by the statute of limitations, and, second, that the proof was insufficient to sustain a verdict for plaintiffs if the action was not barred by the statute of limitations. So it may be that the court sustained the demurrer on both grounds.

Ten specifications of error are presented under three propositions:

(1) Error in holding the evidence insufficient to prove a cause of action in favor of the plaintiffs and against defendant;

(2) Error in holding the cause of action was barred by the statute of limitations; and

(3) Error in excluding certain evidence offered by plaintiffs.

We considered these propositions in their order.

There is evidence to the effect that within the knowledge of old settlers in the vicinity of Blackwell the Chickaskia river never overflowed in the ridge running along the south side of plaintiffs' land and between it and the river, prior to the flood in 1942, except on one occasion. That was in the flood of 1923. That there was some local drainage into the basin on plaintiffs' land so that in its natural state the basin was a swamp and unfit for cultivation; that in 1908 the then owners of the land laid a 10-inch concrete drainage tile from the low point in the basin in a southeasterly direction through the ridge, across the corner of an adjoining tract of land, and onto a farm known as the Wittman farm. That the drainage line was laid with consent of the owner of the Wittman land; that the main line of the drainage tile was about 3,065 feet in length and had a fall of about 3.31 feet or .1 foot per 100 feet; that the upper end of the tile was about 1.5 feet beneath the surface at the low point in the basin; that where the line passed through the ridge it was from six to seven feet beneath the surface, and from the ridge to the outlet it was from four to five feet beneath the surface; that the outlet was not directly into the river, but was into a small ditch or ravine some six or eight feet deep, which let into the river; that the outlet into the ditch or drain was from 12 to 15 feet above the normal level of the water in the river; that the drainage tile functioned from the time it was laid until 1914, at which time plaintiffs' father purchased the farm; that at that time the tile drain was open and functioning and continued to function at all times until the dam was constructed and the water in the lake submerged the outlet; that thereafter it continued to function and properly drain plaintiffs' land until 1942. That the land thus drained was rich soil and produced good crops from 1914 until 1942, except in 1923 when the river overflowed the high ridge filling the basin with water and ruined the crops; that that year the water from the flood did drain out so as to enable plaintiffs to plow the land that fall and a good crop was raised each year thereafter until 1942. That in 1936, when defendant was preparing plans for the dam, it was determined that the dam should be constructed 20 feet high with a spillway in the center about 100 feet wide and .8 feet below the main dam. That the city engineer caused a survey up the river to determine where the margin of the lake would be, i. e., what land would be covered by the water in the lake when the dam would have been constructed and the reservoir filled; that it showed the contour line of the dam, 1,023 feet above sea level, would cross the plain-

tiffs' drain tile some distance back of the outlet and that the water in the lake, when full, would submerge it about three feet. That plaintiffs also had a survey made which checked substantially with that of the city engineer. That the tile drain had a total fall of about three feet so that when the proposed lake would be full the water would, as a consequence, back up through the drain tile approximately its full length; that the level of the lake, when full, would be about 1.5 feet lower than the floor or level of the basin on plaintiffs' land; that when the water level of the lake would rise to about 1.5 feet above the top of the dam water would begin to flow back through the drain tile and spread out on the farm. That in flood times the water would sometimes flow over the dam to a depth of as much as 4.5 feet, and that when it did so, the water would be high enough to back through the drain tile, if left open, to a depth of about 3 feet on plaintiffs' land. That at the time the surveys above mentioned were made, tests were made at some six or eight points along the drain tile line and it was found to be open and in good condition throughout its length. That when the dam was completed in the latter part of May, 1937, it was announced that the gates would be closed June 1st and start filling the lake; that at that time there were extensive rains in the vicinity and the river was beginning to flood; that this was some two or three weeks before harvest time and that plaintiffs and their tenant (a Mr. Riley) had a wheat crop growing in the basin, soon to ripen and ready for harvest; that fearing the flood in the river would elevate the level of the water in the reservoir sufficient to cause it to backflow through the tile drain and thus injure the wheat crop, plaintiff Wilbur Murduck and his tenant placed tow sacks in the outer end of the tile before the rising water in the lake submerged it; that the flood did prove such as to raise the level of the lake some four or five feet higher than normal; that the sacks apparently prevented the backflow of water through the tile so that the wheat crop was not affected. It was later harvested and produced 40 bushels of wheat per acre.

There is also evidence to the effect that after June 1, 1937, the lake had stood practically full, submerging the outlet of the tile, and that rises in the river sufficient to raise the level of the lake as much as two feet or more occurred on an average of seven or eight times a year; that during all that time the drain functioned so as to drain plaintiffs' land until 1942, and that good crops were raised in the basin in the years 1937 to 1941, inclusive.

The evidence further shows that about June 21, 1942, the river again overflowed the ridge and all of plaintiffs' basin land, filling the same to a depth of five or six feet; that when the flood receded the water failed to drain out and that the drain tile since that time has failed to function and that the water still covers part of the basin so as to make it unfit for cultivation.

There is further evidence tending to show that defendant city, in 1943, after this action was commenced, opened the gates in the dam and lowered the surface of the lake some eight or ten feet; that this exposed the surface of the ground around the outlet of the tile and that mud and silt had settled in and over the small ditch into which the drainage tile opened so as to almost completely fill it, and that defendant, with a crew of men, tried for two days to locate the outlet of the tile drain but was unable to find it.

The evidence further shows that again in 1944 the river overflowed the ridge and that at the time of the trial much of the water still remained in the basin.

There was also evidence showing the value of the farm before and after the 1942 flood, and to the effect that plaintiffs' farm was decreased in value to the extent of from $6,000 to $8,000.

The demurrer to the evidence admitted the truth of all the plaintiffs' evi-

dence; and all of the defendant's evidence concerning which there is no conflict must, for the purpose of the demurrer, be considered as withdrawn. It is clear that there was sufficient evidence to take the case to the jury unless the court can say as a matter of law that the act of plaintiff and his tenant in placing the sacks in the outlet of the drain was the sole cause of the damages, or unless plaintiffs' action is barred by the statute of·limitations, which latter question we consider under the second proposition.

It is well settled that where there is any competent evidence reasonably tending to establish plaintiff's cause of action alleged in his petition and reasonably tending to support a verdict and judgment for him, defendant's motion for a directed verdict should be overruled. Greis v. Mitchell, 185 Okla. 136, 90 P. 2d 894. This rule·has been followed in numerous cases. Fitzgereld v. People's Finance & Thrift Co., 184 Okla. 44, 84 P. 2d 625; Hatmaker v. Gripe, 184 Okla. 26, 84 P. 2d 418; Woodward v. Fairbanks, 183 Okla. 151, 80 P. 2d, 250; Deep Rock Oil Corp. v. Fox, 178 Okla. 516, 63 P. 2d 24.

Defendant contends that although the tile drain was open and functioning when the dam was constructed, the question became immaterial when plaintiffs' evidence showed that they themselves had totally obstructed it and prevented its operation by placing tow sacks in the outlet. It is again and again asserted in defendant's brief that plaintiffs' own act in placing the sacks in the mouth of the drain was the sole cause of the failure of the drain to function. This contention, under the record, cannot be sustained.

There is evidence, and it is practically uncontradicted, that for five years after the sacks were placed in the drain the line continued to function and carry off all the water from plaintiffs' land until after the high flood of 1942; that after that flood the city endeavored to uncover the mouth of the drain and when the water level was lowered sufficiently to expose the mouth of the drain, silt and mud had settled in the ditch and over the opening of the drain so as to almost completely fill the ditch into which the drain had opened and to cover the opening of the drain itself, so as to make it impossible to even find the opening of the drainage tile. The evidence does not show that all this occurred as a result of the 1942 flood. The evidence shows that flood sufficient to carry·silt and mud to the mouth of the drain and into the ditch occurred six or eight times each year. Therefore, it cannot be said, as a matter of law, that the evidence conclusively shows that plaintiffs' own acts were the sole cause of the damage. At most, their acts could be no more than contributory negligence, if negligence at all. The Constitution, art. 23, sec. 6, makes the defense of contributory negligence at all times and in all cases a question of fact for the jury, and no court is authorized to say as a matter of law that a plaintiff was guilty of contributory negligence so as to preclude a recovery.

Plaintiffs call attention to the rule stated in Washington County Abstract Co.· et al. v. Harris, 48 Okla. 577, 149 P. 1075, that:

"Where the person injured uses reasonable care to reduce the cost by wrong done him, he can recover from the wrongdoer in full for all damages, even though his own efforts to reduce the loss have·increased it."

Therein is cited the case, of Mogollon Gold & Copper Co. v. Stout, 14 N. M. 245, 91 P. 724. That is a case wherein the facts were very similar to the facts disclosed by the evidence in the instant case. The New Mexico court cited the rule stated in 13 Cyc. 71, 72 wherein it is said:

"Where an injured party finds that a wrong has been perpetrated on him, he should use all reasonable means to arrest the loss. He cannot stand idly by and permit the loss to increase, and then hold the wrongdoer liable for the loss which he might have prevented. It is only incumbent upon him, however, to use reasonable exertion, and the ques-

tion in such cases is always whether the act was a reasonable one, having regard to all the circumstances of the particular case. The application of this rule sometimes has the effect of enhancing the damages, rather than reducing them; but, where a reasonable and bona fide attempt has been made on the part of the plaintiff to reduce the damages, . . . it does not relieve the defendant from a full recovery of the damages claimed."

So, if plaintiffs were in good faith in their efforts to save their 1937 wheat crop, their acts in placing the sacks in the outlet of the tile drain did not preclude recovery, even though their efforts may have resulted in an ultimate increase of their damages. Whether, under all the facts and circumstances, plaintiffs were acting in good faith was a question of fact for the jury. Therefore, it cannot be said, as a matter of law, that plaintiffs were precluded from recovery by placing the sacks in the outlet of the drain pipe.

Unless the evidence shows that plaintiffs' case is barred by the statute of limitations, it was error to sustain the demurrer and enter judgment for defendant. This brings for consideration the second proposition. Plaintiffs assert that their cause of action was not barred by the statute of limitations for two reasons: (a) They assert that their damage did not occur and their cause of action did not accrue until the flood waters entrapped in the basin by the flood of June, 1942, failed to drain off, and that their action was commenced the following August; (b) that if the cause of action did accrue upon the completion of the dam in 1937, the running of the statute of limitations was tolled by the institution and pendency of the injunction action which was dismissed without prejudice less than one year before the commencement of this action.

In support of their first contention, plaintiffs cite and rely upon Pahlka v. C. R. I. & P. Ry. Co., 62 Okla. 223, 161 P. 544; Fletcher v. City of Altus, 188 Okla. 342, 108 P. 2d 781; City of Altus v. Fletcher, 192 Okla. 20, 132 P. 2d 942; and

City of Altus v. Fletcher, 193 Okla. 220, 142 P. 2d 614. The Pahlka Case, supra, follows the reasoning of the court in A., T. & S. F. Ry. Co. v. Eldridge, 41 Okla. 463, 139 P. 254, wherein it is said:

"Aside from what is said in the foregoing opinion, it strikes us as unreasonable to argue that a cause of action is barred by limitation before it arises. The facts in the case at bar do not disclose that plaintiff ever sustained any damage prior to the overflow complained of, and if the embankment in question, be it ever so negligently constructed, had been maintained for a century, the plaintiff would have had no cause of action for damages sustained until they were sustained; hence his right of action necessarily dated from the date of his injuries."

In the Pahlka Case it is said:

"Regardless of the question of the permanence of the improvements, the right of action for injuries does not necessarily accrue at the time of the construction of the improvement. In cases of injuries resulting from permanent improvements, as to the time when the right of action arises, the distinction seems to be that, where the injury is the natural result of the erection of the permanent improvement, or may be regarded as obviously consequential, the cause of action arises at the time of the construction of the improvement; but that, where the injury is not such natural result, or not obviously consequential, the right of action arises at the time of the actual injury. The line of cleavage seems to lie in the certainty or uncertainty of the injurious result."

And:

"The textwriters support the theory that, though the improvement be permanent, if the injurious result is not the necessary consequence, the cause of action arises only when the injury is done, and not at the time of the construction of the improvement."

In the City of Altus Cases, the court followed the rules above stated.

Defendant cites City of Stillwater v. Robertson et ux., 192 Okla. 395, 136 P. 2d 923, and asserts that it is controlling, taking into consideration the fact that

plaintiffs filed the injunction suit before the dam was constructed, together with the allegations in the petition in that case. The Stillwater case is distinguishable from the City of Altus cases, and other cases above cited, in that in the Stillwater case the city, in 1933, raised the height of an existing dam about two feet. The plaintiffs' land was within the area intended to be flooded and laid below the height of the dam when raised. Because of the extended drouth period, the enlarged lake did not fill for more than two years after the dam was raised. Consequently, plaintiffs' land was not flooded during that time. After the land was flooded, plaintiffs brought their action for damages. This court held that the injury to plaintiffs' land was permanent and obvious at the time the dam was raised since it was apparent to everyone that the lake level would in time be raised approximately two feet and thus overflow plaintiffs' land which would be included in the new lake. That was true because it was a matter of mathematical calculation and therefore certain that plaintiffs' land lying below the level of the water in the new lake would be overflowed.

It was not a matter of mathematical calculation or certainty that sand bars would form in the Altus lake, their location and extent, or their effect on plaintiff's crops. No person could foresee what actually happened.

To the extent that plaintiffs claimed in their petition for injunction that the construction of the dam in the instant case would cause the water of said river to be impounded and flow back up through the drain, so that the surface thereof would be as high or higher than the 50 or 75 acres of land lying in the basin, and as a result, make it impossible for the drainage system to operate and thereby cause said land to again become a swamp, the rule in the Stillwater case might be applicable, in that it would be a matter of mathematical calculation how high the water would back up through the drain pipe. But there are other elements which are to be considered.

The evidence shows that for 28 years after the drainage line was constructed, and before the dam was constructed, the drainage line functioned properly. The ditch or drain into which it emptied and through which the water from plaintiffs' land finally drained into the river was not affected. But within the six years between 1937 and 1943, after the dam was constructed, silt and mud formed or settled in and around said ditch to a depth of six or eight feet, filling the ditch and completely covering the drainage line outlet so that it could not be found. It cannot be said that it was obvious when the dam was completed that that would occur. No one could tell, or know, that that would occur or where or to what extent silt or mud would settle at and around the outlet of plaintiffs' drainage tile. No one knew what had happend until the city lowered the level of the lake so as to expose the accumulated silt and mud. Plaintiffs are not suing for damages alleged to have been caused by the city in closing the outlet to the drain pipe so as to prevent water accumulating in the basin from draining out as it had done before the construction of the dam.

Defendant, with much emphasis, calls attention to the uncontradicted testimony of its city engineer to the effect that by his scientific calculation it was shown that in order to raise the level of the lake two feet, that is, sufficient to raise it to the level of the floor of the basin on plaintiffs' land, there must be a rise in the river proper of about 17 feet, and that if the dam were not there, a 17-foot rise in the river would place the water level as high as the floor of the basin. Defendant contends, in effect, that the engineer's testimony not being contradicted or refuted, conclusively shows that the construction or existence of the dam could have no effect one way or the other on plaintiffs' land.

The engineer may be entirely correct in his estimate insofar as the effect of the dam in raising the water level of the lake opposite plaintiffs' land is concerned, but it in no way explains away or offsets the accumulation of silt and mud around and over the outlet of the drainage line. The fact remains that it did not so accumulate in the 28 years, and possibly centuries, next before the construction of the dam. It did accumulate in five or six years after the construction of the dam.

It does not appear as a certainty that plaintiffs' damages were obvious at the time the dam was constructed. In any event, it would, under the rules stated in the decisions above cited, be a question of fact for the jury and not one for the court. We cannot say as a matter of law that plaintiffs' action was barred by the statute of limitations.

Defendant presents still another reason why the judgment should be sustained. It is that plaintiffs are suing for permanent damages and that they plead ownership of an easement over the adjacent land through which their drainage line extended; that it developed at the trial that insofar as the Wittman land is concerned, the owner of plaintiff's land at the time he constructed the drainage line, obtained apparently oral permission therefor from the owner of the Wittman farm.

It is asserted that it was incumbent upon plaintiff to prove ownership of the easement across the adjacent land, either by prescription or grant, and if by grant, it must be in writing; that as to the Wittman farm they did not prove ownership by grant but did prove permissive right only, and that permissive right cannot ripen into title by prescription. Defendant further contends that the right to use the Wittman land may be withdrawn at any time and that plaintiffs failed in their proof of ownership of a permanent easement across the Wittman farm, and therefore may not recover for permanent damages.

In this connection, defendant cites Catterall v. Pulis, 137 Okla. 86, 278 P. 292, wherein it was held:

"An easement for a private way is an interest in lands and cannot be created by a parol grant, but requires a deed or prescription."

And:

"A mere permissive use of the lands of another is not adverse and cannot give an easement by prescription, no matter how long it may be continued."

Plaintiffs cite numerous cases holding to the effect that possession of real property is prima facie evidence of ownership, and cite other cases going to the question of possession under claim of title sufficient to ripe into title by prescription. The cases cited by defendant on this question state the general rule. But there appears to be a well-established exception thereto. In this connection, before considering the exception to the rule, we call attention to the quotation by Mr. Justice Osborn, from Gulf, C. &. S. F. Ry. Co. v. Johnson, 54 F. 474, 4 C. C. A. 447, in Fletcher v. City of Altus, 188 Okla. 342, 108 P. 2d 781, that:

"The plaintiff was in the actual peaceable possession of the land and the hay cut from it. As against a wrongdoer, possession is title. The presumption of the law is that the person who has the possession has the property, and the law will not permit that persumption to be rebutted by evidence that the property was in a third person, when offered as a defense by one who claims no title, and was a wrongdoer."

And also the quotation therein from the note in 39 A. L. R. 960, that:

"Third persons, who are in no way connected with the rightful owner of the land, of course, cannot set up such person's title to defeat the title of one who, though a trespasser, cultivates a crop on the land. Barnhart v. Ford (1887) 37 Kan. 520; Lindsay v. Winona & St. P. R. Co. (1882) 29 Minn. 411, 43 Am. Rep. 228, 13 N. W. 191; Cullen v. Bowen (1905) 36 Wash. 665, 79 P. 305".

With reference to the exception to the general rule above stated, the well-considered case of Shaw v. Proffitt, 57 Ore. 192, 109 P. 584, and particularly the opinion on rehearing 57 Ore. 192, 110 P. 1092, states the rule:

"While ordinarily an easement can be created only by writing under seal, it may be created by adverse user, by estoppel, or part performance of a parol agreement."

"An express oral license, becoming irrevocable by execution, by expenditures in permanent improvements in reliance thereon, inuring to the benefit of the licensor, if relating to the use or occupation of real estate, become an easement."

And:

"The licensor's attempted revocation of the express license, which has been executed by expenditures in permanent improvements by the licensee to the knowledge of the licensor is a fraud, against which equity will relieve by estoppel."

The opinion quotes with approval from Curtis v. LaGrande Water Co., 20 Ore. 34, 44, 23 P. 808, 810, the following:

"An executed license is treated like a parol agreement in equity; it will not allow the statute to be used as a cover for fraud; it will not permit advantage to be taken of the form of the consent, although not within the statute of frauds, after large expenditures of money or labor have been invested in permanent improvements upon the land, in good faith, upon the reliance reposed in such consent. To allow one to revoke his consent, when it was given or had the effect to influence the conduct of another and cause him to make large investments, would operate as a fraud and warrant the interference of equity to prevent it, under the doctrine of equitable estoppel. The ground of the jurisdiction is to prevent injustices or fraud."

In Gyra v. Windler, 40 Colo. 366, 91 P. 36, many cases are cited from various jurisdictions showing the exception to the general rule to be recognized in many jurisdictions. Under the exception, the defendant's contention cannot be sustained.

There was sufficient evidence to take the case to the jury; plaintiffs' cause of action was not barred by the statute of limitations as a matter of law; a sufficient showing was made to sustain plaintiffs' right to the easement pleaded. The judgment of the trial court must be reversed.

In view of the probability of a new trial, plaintiffs' third proposition should be considered. They sought to prove a conversation had by plaintiff Wilbur Murduck with the commissioners of defendant city prior to the construction of the dam, concerning plaintiffs' claim that the construction of the dam to the proposed height would injure his drainage ditch. This was an effort to show that the city commissioners contended that plaintiffs' land would not be damaged by the construction of the dam as proposed and was intended to show the attitude of the commissioners of the city at that time was that plaintiffs' land would not be damaged by the construction of the dam. This was evidence tending to go to the question of whether the damages were obvious at the time and before the dam was constructed. The evidence should have been admitted. Plaintiffs also sought to prove by the witness O. A. Rafferty, who was mayor of defendant city at the time the dam was constructed, that so far as could then be seen, the city acquired all the rights that would be affected by the construction of the dam. The court excluded the testimony. That also went to the question of whether the damage to plaintiffs' land was obvious, and this testimony should also have been admitted.

Reversed and remanded, with directions to grant a new trial.

HURST, V. C. J., and OSBORN, DAVISON, and ARNOLD, JJ., concur. GIBSON, C. J., dissents.