CITY OF BLACKWELL v. MURDUCK et al.

No. 34908.   April 23, 1952.

Rehearing Denied May 20, 1952.

*244 P. 2d 817.*

Rodgers & Gurley and Peyton E. Brown, City Atty., Blackwell, for plaintiff in error.

Irving D. Ross and David Ross, of the firm Ross & Ross, Newkirk, for defendants in error.

O'NEAL, J. This is the third time the controversy between Wilbur Murduck and the city of Blackwell, Oklahoma, upon the issue of damage to Murduck's land, is presented to this court. Murduck et al. v. City of Blackwell, 198 Okla. 171, 176 P. 2d 1002, in which case we held the trial court erred in sustaining a demurrer to plaintiff's evidence and dismissing plaintiff's action. In the City of Blackwell v. Murduck et al., 202 Okla. 216, 212 P. 2d 135, we sustained the trial court's action granting Murduck a new trial after a verdict was returned in favor of the defendant city.

The present action is based on identical allegations in the two previous cases. Upon trial in the instant case, Murduck recovered a judgment against the city of Blackwell in the sum of $8,000, and, from a denial of the city's motion for a new trial, it appeals. The parties will be here referred to as plaintiff and defendant as they appeared in the trial court; or, in the alternative, as Murduck and the City.

The City contends the present case must be reversed on the following grounds:

(a) That plaintiff's exclusive remedy was by a condemnation proceeding under the eminent domain law of the State and that the trial court was, therefore, without jurisdiction to enter a judgment upon the jury's verdict.

(b) That plaintiff failed to sustain the burden of proof that the defendant's lake caused any injury to the plaintiff's land.

(c) That the court's instructions are erroneous, conflicting and prejudicial, and that the court failed to give adequate instructions on the meaning of the terms "proximate cause" and "intervening cause".

These respective contentions will be answered in chronological order in conjunction with an analysis of the evidence in the record.

A historical resume of the case discloses that the predecessor in ownership of the Murduck farm consisting of 160 acres, located approximately in the northwest corner of Kay county, Oklahoma, in the year 1908 constructed a tile drainage ditch 3,065 feet in length, running from a low point on swamp land to its outlet near the Chikaskia River. The drain was constructed of regular drainage tile ten inches in diameter, laid end to end, leaving interstices at each tile joint. Water could thus enter the tile drain at each joint, as well as seep therefrom. Approximately in the center of the Murduck farm was a tract of low swampy land which had no natural drainage outlet of the surface water draining into the depression. The tile drain for a distance of 3,000 feet was laid to a constant grade of one-tenth of one foot to each 100 feet. The end of the drain, approximately 65 feet thereof, made a more violent grade to the Chikaskia River.

The drainage system successfully drained surface water from the land from 1908 to 1923. The low land thus drained raised better wheat, corn, oats and alfalfa than on plaintiff's adjoining upland, or on adjoining farms. The great flood of 1923 caused the Chickaskia River to overflow the ridges on plaintiff's farm, completely filling the

lowlands to depths of a few inches to more than eight to ten feet. This water was successfully drained from the land by the drainage ditch, and the land was successfully farmed thereafter to and including the year 1942, producing abundant crops, as it had in previous years. In the latter year, the city lake overflowed the land, and thereafter it was again flooded by high water from the city lake during the years 1944, 1945 and 1947.

The City, in the year 1937, constructed a concrete dam over the Chikaskia river at a point approximately a mile and three-quarters below plaintiff's farm. The dam was 800 feet long with a spill-way near the top center thereof. The elevation of the dam was 1,023 feet above sea level, and the elevation at the bottom of the plaintiff's swamp land where the intake tile was based was at approximately the same elevation as the city dam. After the gates of the dam were closed, the water in the river formed a lake extending some miles above the plaintiff's land.

After the construction of the city dam in the summer of 1937, the plaintiff, in company with Mr. Riley and Mr. Alford, made an inspection and examination of the tile drain in six or seven separate places by digging down to the tile, removing several sections thereof, and upon examination found that there was no obstruction in the line and that it contained some clear water. Mr. Alford, a civil engineer, had made surveys of the land in 1908, and the drainage line was laid under his supervision and direction. As stated, he assisted in the examination of the line in 1937 shortly before the gates of the city dam were closed. He checked his original field notes made in 1908 and found that the elevation of the city dam was higher than the intake line of the plaintiff's drainage system, and determined that the water from the lake, when reaching the dam's capacity, would enter the outlet end of the drainage line and flood plaintiff's land, and so advised plaintiff.

In this investigation in 1937, Alford found that the high flood of 1923 had completely covered the tile outlet with sand and gravel. He removed the sand and gravel and found clear water flowing from the outlet, and, from said investigation, gave it as his opinion that the drainage system at that time was operating successfully. That the drain operated successfully is supported by evidence that plaintiff's low land was successfully farmed and abundant crops raised after the construction of the dam during the years 1937, 1938, 1939, 1940 and 1941. Thus, from the big flood of 1923 to the summer of 1942, a period of 19 years, the land was sufficiently drained by the drainage system so that plaintiff was able to and did raise good crops from the low land which, however, was subject to some surface drainage by rain. Upon the advice of Mr. Alford, the engineer, that high flood waters receding from the lake would back up into the drainage system, clog the line with sediment and debris, plaintiff in the summer of 1937 removed the sand and gravel at the outlet end of the line, stuffed some gunny sacks in the end of the tile, and placed an iron drum over the outlet for the purpose of keeping the high water from the defendant's lake entering into the line and reversing its flow.

The record discloses the water flooded the land in 1942, 1944, 1945 and 1947; and that the water from the lake, from the year 1942 to 1947, completely covered the end of the tile drainage system and the iron drum cover, and has thus remained in that condition to the date of trial. The overflows for the years 1942 to 1947 referred to caused the water to be impounded upon plaintiff's land, covering, at various times, from 50 to 80 acres thereof, and which water failed to drain away through the drainage tile, as it had prior to said years.

A variable number of acres was inundated annually; the injury to the land had accumulated insidiously. Whereas previously the land was fertile and productive, it now is a fen of stagnant waters.

The City produced evidence of its engineer and engineering associates tending to prove that, in their judgment, the drainage line was laid too level; that it did not have enough drop to keep the water flowing readily and to keep the line clean; that in taking up of the line, as testified to by plaintiff, injury may have resulted by not replacing the tile and relaying it in a proper manner, which would necessarily permit soil and debris entering the line and causing obstruction thereof. It was also stated that the tile being laid joint to joint with interstices, that grass, shrub and tree roots might have grown into the line, and that the examination made by plaintiff in the seven places referred to by him did not, in their judgment, establish that the line was free from obstruction at other points thereof. The defendant also introduced evidence tending to prove that the erection of the dam did not raise the lake water to a sufficient elevation to back water into the plaintiff's drainage system. Significantly, however, defendant's engineers sent out five or six of the City's employees who spent two days in making excavations to locate the outlet drain of the system. They were unsuccessful in locating it. Just prior to doing this excavation, the city engineer opened the gates of the dam to lower the lake level. He stated that his reason for lowering the lake level was to prevent water at the tile drain outlet from interfering with the excavation work.

Substantial evidence sustains plaintiff's contention that approximately 50 acres of cultivated land and 30 acres of grass land were permanently destroyed by the overflowing waters occurring in 1942 and thereafter to the date of the trial and that the land thus inundated has been for those years unproductive for agricultural purposes.

Witnesses for the plaintiff placed the value of the land before the overflows at from $16,000 to $20,000, and after the overflows from $6,000 to $8,000. The defendant called one witness to testify as to the market value of the Murduck farm as of 1937, immediately before the dam was constructed. This witness placed a value on plaintiff's land as of that time at $12,000 and stated that after the dam was completed the plaintiff's land was worth $18,000. The jury placed plaintiff's permanent injury and damage at $8,000, which, under the facts established, cannot be declared excessive.

The defendant, by its demurrer to the plaintiff's evidence, and by motion for a directed verdict, and throughout the entire proceedings, raises the question of the court's jurisdiction of the cause of action in the nature of a civil proceeding. Its contention is that where land is taken or damaged for a public use that the special proceeding under the eminent domain statutes of the state is the sole remedy of plaintiff. In support of this contention, defendant cites Chicago, R. I. & P. Ry. Co. v. Jennings, 175 Okla. 524, 53 P. 2d 691; Oklahoma City v. Wells, 185 Okla. 369, 91 P. 2d 1077; and a Kansas case, Cruse v. Chicago, R. I. & P. Ry. Co., 138 Kan. 117, 23 P. 2d 471; and also calls our attention to the Oklahoma Constitution, §24, art. 2, and Tit. 66 O.S.A. §57. The Oklahoma cases, supra, do not sustain defendant's contention. In each of the cited cases, the land was actually taken for a public use. The defendant city here does not contend that it has actually taken any of plaintiff's land. Moreover, it denies that any of its acts in any manner affected plaintiff's property rights.

In Chicago, R. I. & P. Ry. Co. v. Jennings, supra, we held:

"But the Legislature has never provided for the institution of condemnation proceedings by a railroad company, or city, nor by the landowner, where no part of the property is desired as a location for a railroad and no᾿ part thereof has been taken and occupied for public use."

and in the second syllabus of the case, we stated:

"In cases where no part of the owner's property is actually taken or oc-

cupied for public use in connection with the construction or operation of a railroad, such owner may sue for damages but the measure of damages and rules of evidence are the same as though a condemnation proceeding had been brought."

In the Wells case, the city had obtained a deed from the railroad company and had taken possession and was occupying and using the lots conveyed. The action was instituted as a proceeding in condemnation. The City pleaded as a defense the statute of limitations and the only material matter for the court's decision was whether the action was barred by lapse of time. The court in that case stated:

"Where such special remedy is provided by law, and no time limit for instituting such special proceedings is fixed, the general statute of limitations for bringing a civil action or suit is not applicable. * * *"

This court, in discussing the distinction between cases involving the taking of property and those cases involving only damage to property, stated:

"* * * From the above constitutional and statutory provision it is clear that the legislative intent is that the remedy afforded by condemnation proceedings shall be exclusive where any part of an owner's land has been taken and occupied for public use * * *. But * * * where no part of the owner's land is taken and occupied for public use, but some consequential damage is occasioned by the construction and operation of a public utility, the owner may not avail himself of the remedy of the condemnation proceedings, but may resort only to a common-law action."

The defendant further contends that it has been deprived of a substantial right for the reason that if the proceeding had been instituted under the eminent domain statute and an award had been approved by a jury upon a trial in the district court, the City, if it felt itself aggrieved by the amount of damages assessed, could decline to take the property and thereby relieve itself of the judgment. In support of this contention, defendant cites Cruse v. Chicago, R. I. & P. Ry. Co., 138 Kan. 117, 23 P. 2d 471. The citation is erroneous, as that case construes the Workmen's Compensation Law of the State of Kansas, and no more. But the contention is not supported by the Kansas court.

In Stewart v. Marland Pipe Line Co., 132 Kan. 725, 297 P. 708, that court held:

"Where an oil pipe line company instituted proceedings to condemn a right of way across real estate, and the proceedings have progressed to where there has been an appeal to the district court from the award of the appraisers, and the question of damages has been submitted to the jury, and the jury has returned a verdict, the pipe line company cannot escape liability by abandoning the proceedings."

Defendant's last contention is that the court's instructions as a whole did not adequately submit the issues to the jury. Defendant's motion for a new trial does not allege errors in the giving of the respective instructions, and, therefore, we are not called upon to consider the alleged errors. We have, however, examined the instructions and are of the opinion that they fairly submitted to the jury the issues raised by the pleadings and the evidence. The court properly instructed the jury that if they found that the damage to plaintiff's land was permanent in its character that the measure of damage would be the difference in the market value of the land immediately prior to and after the damage.

The court's instruction with reference to the stoppage of the outlet is not erroneous, for he advised the jury that, where a person injured by the wrongful act of another uses reasonable care to reduce the loss to him, he can recover from the wrongdoer in full for the damage, even though his own efforts to reduce the loss have increased it. This latter instruction was declared to be the law in the previous appeal of this case. Murduck v. City of Blackwell, supra.

The verdict of the jury is sustained by the evidence; the instructions fairly define the issues in the case and declare the applicable law.

Therefore, the judgment of the trial court is affirmed.

ARNOLD, C.J., HALLEY, V.C.J., and CORN, GIBSON, DAVISON, JOHNSON, and BINGAMAN, JJ., concur.