**TULSA MUNICIPAL AIRPORT TRUST, a public trust, and American Airlines, Inc., Appellants,**

v.

**NATIONAL GYPSUM COMPANY et al., Appellees.**

**No. 48150.**

Court of Appeals of Oklahoma, Division No. 2.

Feb. 3, 1976.

Rehearing Denied March 3, 1976.

Certiorari Denied June 15, 1976.

Released for Publication by Order of Court of Appeals June 18, 1976.

Remington Rogers, Tulsa, for appellants.

Whitten, McDaniel, Osmond, Goree & Davies, Tulsa, for appellee Manhattan Construction Co.

Glenn R Davis, Tulsa, for appellee G.A.F. Corp.

BRIGHTMIRE, Judge.

Within 17 months after its completion the huge four-acre roof of plaintiffs' new aircraft hangar—a structure nearly half as big as Houston's famed Astrodome—began to leak. Later, while this million-dollar lawsuit pended against various companies and individuals who had played some part in constructing the facility's faulty overhead, plaintiffs say they successfully undertook to minimize their continuing losses through engaging the professional services of an attorney and a renowned roof expert. Their effort to recover fees charged by these two professionals as mitigation expenses was thwarted when demurrers to plaintiffs' amended and supplemental petition were sustained and their action dismissed. It is of this ruling reversal is sought.

I

The two plaintiffs are Tulsa Municipal Airport Trust and American Airlines, Inc. (American). The trust is a public one whose sole beneficiary is the City of Tulsa, Oklahoma. It was formed many years ago and used as a means of financing the construction of an aircraft overhaul and maintenance facility on a portion of Tulsa International Airport land, which it leased from the City of Tulsa and subleased to American.

By 1967 American developed a need for an additional hangar large enough to over-haul and service jumbo jet aircraft. On February 21, 1968, it contracted with an architectural firm by the name of Frankfurt-Short-Emery-McKinley, which designed and prepared plans for a building about 303 feet wide, 556 feet long, and 110 feet high. The architects, it is alleged, specified "a multi laminated asphalt and felt type roof, on a roof deck of Tectum tiles, each strip or tile to be approximately 90″ long and 30″ wide; the deck to be supported by bulb tees resting on open web steel joists to be supported by steel trusses."

Manhattan Construction Company (Manhattan) undertook as general contractor to construct the hangar. For building the roof Manhattan let a subcontract to Lakeland Roofing-Sheet Metal Acoustical Company, which used materials furnished by G.A.F. Corporation and National Gypsum Company. Work started on the building in April 1969 and was completed by the following June.

Then, according to plaintiffs, beginning in the fall of 1970 the roof "failed to function as a roof" because of "countless leaks at various points throughout." Plaintiffs demanded defendants correct the defective roof. They tried to, but despite repeated attempts never could, and at last conceded the roof was a complete failure.

This lawsuit was filed October 28, 1971 against all of the earlier-mentioned construction participants charging that the negligence and breach of warranties by each caused plaintiffs to suffer over a million dollars in roof replacement costs and in loss of use since January 1, 1971, at the rate of $5,000 per month. Each defendant, of course, filed an answer denying that the contribution it or he made to the roof construction was in any way responsible for the dismal failure. The issues raised by these pleadings were never tried, however, because as alleged in an amended petition filed in August 1973, plaintiffs' efforts to minimize their damages successfully ended in an agreement by defendants to reconstruct the roof.

The amended petition and a later supplement to it set out in some detail the background facts and circumstances underlying plaintiffs' efforts to minimize their losses. To begin with, they say, they did not know whether the cause of the failure was "faulty design" or "defective materials" or "improper application of the materials" or a combination of each. Obviously plaintiffs under the circumstances were faced with a serious problem. Substantial loss of use damages were occurring monthly. Seemingly endless settlement negotiations bore no fruit primarily because the exact cause remained obscure discouraging any defendants from admitting responsibility. And there was the enormous cost potential of an adequate redesigning and rebuilding of the roof. These circumstances reduced plaintiffs' options to these: (1) finance a reconstruction of the roof or (2) allow continuing loss of use damage to pile up while extended litigation judicially determined which defendant or defendants were liable. In either case there loomed the further question of whether an ultimate judgment could be fully satisfied—a question which could not be entirely disregarded.

■ And beyond these practical considerations was the law. The victim of a tort or contract violation may not stand idly by and permit a preventable loss to increase. He has the duty to use all reasonable means to arrest the loss—a general rule we will go into more fully later. *Murduck v. City of Blackwell,* 198 Okl. 171, 176 P.2d 1002 (1946).

For guidance in the proper discharge of its loss-minimization duty, plaintiffs allege they in good faith called upon their attorney for help and to him submitted "all available data concerning design and original construction of the roof with all of the documents of the various defendants pertaining to their original participation and separate guarantees. . . . [and] copies of the reports and opinions of the experts who had been separately employed by some of the defendants [revealing that the opinion of each such expert] conflicted with the findings and conclusions of the other experts." After analyzing this material, the attorney reported his findings and conclusions to plaintiffs. As a result they "employed a Mr. Gumpertz of Cambridge, Mass., a recognized expert specializing in the field of defective roofs." At plaintiffs' expense, Gumpertz and his crew examined the roof both grossly and by means of a laboratory analysis. The roof expert issued a report concerning his findings, conclusions, and recommendations to plaintiffs, who in turn made a copy of it available to each defendant.

Defendants still took no action. So, once again plaintiffs sought the advice of their attorney as to what they could and should do next. He recommended that arrangements be made for the chief executive officer of each defendant to attend, without its attorneys, a meeting to be held at American's offices on November 20, 1972. Expert Gumpertz was to be present at this meeting to explain his findings and two alternative methods of correcting the roof defect he could approve.

Such a meeting was eventually held. Gumpertz explained his findings and then recommended as a first alternative the removal of the entire roof "down to the bulb tees" and replacing of existing tectum tile with steel decking covered with felt and asphalt roofing material. The second alternative which the expert thought might do—but one he would not guarantee to be effective—required removal of all existing roofing material down to the tectum deck and replacement of all sagging or weak tectum tile. The tile was to then be recovered with two layers of fiberglass, which in turn was to be covered with felt and asphalt roofing materials.

Following Gumpertz' presentation, all defendants agreed to participate in reconstructing the roof as outlined in the second recommendation, each, generally speaking, making a contribution similar to that made in regard to the original construction. However, finite details remained to be

worked out and, as it turned out, several months of tedious negotiation took place before a complete agreement was reached. Finally, on August 8, 1973, all parties signed a stipulation calling for reconstruction of the roof by defendants. To expedite performance plaintiffs agreed to "waive their claims for damages by reason of the failure of the [original] roof . . . and all claims for consequential damages including loss of use, damages from leaks or other losses alleged to have been sustained . . . ."[1] However, following this language the stipulation recites that "Plaintiffs reserve for adjudication and do not waive any of their costs in obtaining expert opinion and service as to the cause of the failure of said roof, and appropriate means for restoring the same or otherwise, or for the costs of this action, or the attorney fees incurred, or to be incurred, by plaintiffs."

The foregoing provision, allege plaintiffs, "reserved for adjudication all plaintiffs' claims for costs and expenses incurred by plaintiffs for the services of its attorney and the services of said expert necessary to mitigate the damages of plaintiff resulting from the defective roof . . . ." Such loss-reductional expenses include $15,335.19 for the roof expert's fee and $18,660 for the services of an attorney.

Defendants all promptly filed demurrers to the amended petition and, eventually, supporting briefs. They were sustained. A supplemental petition was filed in August 1974 and again it was met with a general demurrer from each defendant and a special one from every defendant except G.A.F. Corporation. In January 1975 the supplemental petition met the same fate as the one supplemented—sustention of all defendants' demurrers, both general and special. Plaintiffs elected to stand on their amended petition as supplemented and to appeal from an order of dismissal.

## II

Summarized, plaintiffs' argument is that the law permits a tort victim to recover expenses incurred in a reasonable, good faith effort to minimize his damages—expenses which may include attorney and other expert fees—and it therefore was not legally permissible for the trial court to conclude as a matter of law that plaintiffs' petition, asking for recovery of expert fees expense alleged to have been reasonably incurred for the purpose of reducing losses resulting from defendants' tortfeasance,[2] did not state facts sufficient, if true, to entitle plaintiffs to the relief sought.

Only defendants G.A.F. and Manhattan have countered with an appellate brief and in their opening statement they narrow the legal issue with this language: "The argument of defendants, Manhattan Construction Company and G.A.F. Corporation, is quite simple. *There is no statutory or contractual provision which would allow plaintiffs to recover attorney or expert fees as costs of litigation disguised as an attempt to minimize damages,* since the initial cause of action was one in implied warranty in tort and negligence."

---

1. Plaintiffs also agreed to bear certain other costs in order to achieve a consensus.

2. Appellants do not touch upon the "Special Demurrers" of defendants which were sustained, nor do the two responding appellees—G.A.F. and Manhattan. The reason for this is probably two-fold: (1) the first specified ground—that the amended petition as supplemented "is a material variance of the original petition . . . and the causes of action stated in the Amended Petition, if any, are therefore barred by the Statute of Limitations"—is obviously without merit because the amended petition reveals on its face that it was filed less than a month after the stipulation was signed by the parties, which was the culmination of the mitigational efforts of appellants; and (2) the second stated ground—"costs and attorneys fees [sought in the amended petition] can only be awarded by statute, case law, or contract, and they [plaintiffs] have not plead facts sufficient to constitute a cause of action relative to this claim"—like the first, is not properly the subject of a special demurrer, and was therefore considered by the parties merely as the primary ground for the general demurrer.

This statement implies a recognition on defendants' part that there is a distinction between "costs of litigation" on the one hand, and "costs of mitigation" or damage-minimization expenses on the other, and that the principles of law pertaining to recovery of the latter differ from those governing the former. Nevertheless, defendants march bravely out onto the legal battlefield where they make a vicious attack on the nonbelligerent "litigation" issue, completely ignoring their real enemy—the mitigation question—save to denounce it as a "disguise," scorn it as a "semantic ploy," and cavil at plaintiffs' advancement of the expense theory as "word games," after observing, perhaps prophetically, that "academic games are no substitute for judicial analysis." And so the wonder is, how do defendants hope to win a legal war waged by an enemy they decline to engage?

Defendants' ten-page argument in defense of the trial court ruling may be summarized as follows. Their demurrer admitted as true all the facts pleaded in the amended petition as supplemented, thereby raising an issue of law as to whether or not it described a recoverable claim for expert fees. Defendants, of course, say it does not because the claim in reality is for the recovery of the "costs of litigation," which in Oklahoma with regard to attorney's fees "are not recoverable in the absence of statute or specific contractual authority" citing *Hanska v. Hanska,* Okl., 395 P.2d 648 (1964) and several other cases.

Our attention is then directed to the fact that plaintiffs' pleading contains no allegation that defendants ever contracted to pay any attorney's fees or costs of experts in case of damage or loss, and the only statute on the subject is 12 O.S.1971 § 936 specifying that in certain civil actions "the prevailing party shall be allowed a reasonable attorney fee," which, defendants remind us, cannot apply here because plaintiffs have not and cannot become "prevailing" parties.

And not only that, continue defendants, but plaintiffs "are not entitled to the cost of any expert or other costs"; because in *Sarkeys v. Haas,* Okl., 402 P.2d 894 (1965) it was held that "there is no common law rule that permits recovery of *expenses of litigation* and if any such right exists it must be statutory." (emphasis added)

Next defendants turn to what they refer to as plaintiffs' "specious argument" concerning recovery of mitigation expenses and undertake to analyze a couple of Oklahoma cases cited by plaintiffs which apply the doctrine of mitigation. Instead, however, of discussing the doctrine itself in terms of its substance, scope, and applicability generally, defendants abruptly toss them aside as irrelevant because, they say, (1) no attempt was made to recover the cost of any "expert witness fee . . . although . . . [one] did testify," or attorney's fees, and (2) there was no "prevailing party." Merely to recite these two observations is to expose rather dramatically defendants' failure to recognize the distinction between litigation expenses on the one hand, and mitigation expenses on the other.

Defendants' misapprehension becomes even more pronounced when the two cases are analyzed. The first one, *City of Enid v. Crow,* Okl., 316 P.2d 834 (1957), upheld as "special damages," plaintiffs' recovery of expenses incurred by them in relocating their water well after the defending City of Enid had drilled one on adjoining land and had depleted the subterranean, percolating water supply through sales to its inhabitants. After saying there was evidence to establish the prerequisite facts—reduction of water supply in plaintiffs' old well by defendant's well usage—the high court held plaintiffs were entitled "to recover all legitimate expenses reasonably incurred by them in an honest endeavor to reduce the damages flowing from defendant's wrongful acts. The foregoing principle of law," continued the court, "is expressed in 25 C.J.S., Damages § 49, p. 531, and applied in *St. Louis & S.F.R. Co. v.*

*Farmers' Union Gin Co.*, 34 Okl. 270, 125 P. 894. It follows then that plaintiffs were entitled to recover the cost of equipping the new well, less the salvage value of the old equipment, *and all other reasonable expenses incurred in connection with their good faith efforts to obtain an adequate substitute water supply.*" Can it be said this statement in *Crow* of the mitigation rule would have excluded recovery of expert fees had it been shown that the plaintiffs reasonably needed to employ one or more such experts in order to relocate the well? Certainly not. By dictionary definition the term "expert" refers to one "having, involving, or displaying special skill or knowledge derived from training or experience."[3] A water well driller clearly comes within this definition, and although in *Crow* the city drilled the relocated well, the court's language leaves no doubt that plaintiffs could have recovered such drilling expenses had they had to employ the services of an "expert" water well driller themselves.

The second case defendants discuss is *Murduck v. City of Blackwell*, supra. In this case the mitigation doctrine entered through the back door as rebuttal to the defending city's effort to escape plaintiffs' charge of liability. Part of farmer Murduck's land was a low, basin-like area lying near the Chickaskia River with no natural drainage. In 1908 the then owner laid a 10-inch tile drainage line reaching 3,065 feet from the basin to a ravine which emptied into the river. Elevation of plaintiffs' tile outlet was 1,018.89 feet above sea level. Things went well until the City of Blackwell completed construction of a dam across the river upstream in May 1937. Because the dam's design called for a normal water level of 1,022.2 feet above sea level (3.31 feet above plaintiffs' drain), plaintiffs, who had already unsuccessfully sought to enjoin the dam from being built so high, began to become apprehensive about the safety of their wheat crop growing in the basin after June floods started filling the dam-created lake. So, to prevent crop injury from lake backflow through the tile drain, plaintiff Murduck and his tenant placed tow sacks in its mouth before its inundation. This act proved to be a wise one because before long flood waters caused the lake to rise way over the drain tile. When the lake receded, the drain continued to function well until after a 1942 flood, when the city tried in vain to uncover the drain which by then had settled deeper into the ground and was covered with silt and mud. Plaintiffs sued for damages. Among defendant's defenses was a contention that the cause of the drain failure was not the lake, but plaintiff's own act in stuffing the tow sacks into it. In the course of rejecting this contention the court told of how plaintiffs called its attention to a counterpoint—that they were justified in plugging the drain to prevent loss of their crop under the principle of mitigation. In agreeing, the court referred to language of an earlier case—*Washington County Abstract Co. v. Harris*, 48 Okl. 577, 149 P. 1075 (1915)—which is worth repeating here because it adds a bit more insight into the scope of the doctrine. Said the *Murduck* court, " 'Where the person injured uses reasonable care to reduce the cost by wrong done him, he can recover from the wrongdoer in full for all damages, even though his own efforts to reduce the loss have increased it.' " Citing a New Mexico decision, the court continued, " 'Where an injured party finds that a wrong has been perpetrated on him, he should use all reasonable means to arrest the loss. He cannot stand idly by and permit the loss to increase, and then hold the wrongdoer liable for the loss which he might have prevented. It is only encumbent upon him, however, to use reasonable exertion, and the question in such cases is always whether the act was a reasonable one, having regard to all the circumstances of the particular case. . . .' "

3. Webster's New Collegiate Dictionary 403 (8th ed. 1974).

The court then said that "if plaintiffs were in good faith in their efforts to save their 1937 wheat crop, their acts in placing the sacks in the outlet of the tile drain did not preclude recovery . . . ." and added, "Whether, under all the facts and circumstances, plaintiffs were acting in good faith was a question of fact for the jury."

### III

Accepting, then, as true the allegations in plaintiffs' amended and supplemental petition and construing them in a light most favorable to them as defendants agree we must do, we can hardly escape the conclusion that plaintiffs pleaded a foundation for the recovery of expenses incurred in an effort to reduce their continuing loss, unless for some reason fees for professional services, like those rendered here, are excluded from the mitigation rule. For we are satisfied plaintiffs are not, as defendants insist, asking for expert "witness fees" or for attorney's fees for the prosecution of the lawsuit or for any other cost of the "litigation." They restrict their pleading and request to expenses of "mitigation."

■ We have not found a decision in this state dealing with the recovery of expenses incurred for the particular type of professional services involved here. But there are some with regard to other types of professional services. For example, it is "well settled that it is the duty of a person injured by the negligence of another to use ordinary and reasonable diligence or due care in securing medical and surgical aid after receiving such injury." *Jones v. Eppler,* Okl., 266 P.2d 451, 48 A.L.R.2d 333 (1953). This reductionary rule is an offspring of what has sometimes been referred to as the doctrine of avoidable consequences. It is expressed in terms of a duty, but carries with it an equally well-established correlative right in the performer to recover from the wrongdoer the expenses incurred in fulfilling the duty.

And an attorney fee for the unsuccessful defense of a quiet title suit was among the special damages held recoverable in a suit against an abstractor for losses resulting from the omission of a recorded deed from an abstract—a deed held by one who brought the quiet title action against plaintiff. *Washington County Abstract Co. v. Harris,* supra. The supporting rationale was the doctrine of avoidable consequences, that is, that it was incumbent upon plaintiff to use reasonable means "to reduce any damage he might sustain by reason of the erroneous abstract." Though *Harris* cites cases authorizing recovery of counsel fees and other litigation expenses incurred in the defense or prosecution of an action made necessary by the wrongful act of another—for example, defense of a malicious prosecution suit—such cases do not really involve mitigation principles, but rather recovery of primary damages proximately caused by the wrongful act of defendants. In *Harris,* to recover against the abstract company, it was not necessary for plaintiff to defend the quiet title action, except insofar as plaintiff appeared to have a reasonable chance of being successful. But she did defend, and the court found there existed sufficient circumstances to justify plaintiff in believing "there was a reasonable probability of defeating [the quiet title] action." Had plaintiff succeeded, the consequences of the abstractor's wrong would have been mitigated. But whether the quiet title action was won or lost, the abstractor was still liable for expenses incurred in the effort to reduce the loss under the circumstances.

At the turn of the century our neighboring state of Kansas concluded, as stated in its first syllabus of *First Nat'l Bank v. Williams,* 62 Kan. 431, 63 P. 744 (1901), that "[a]ttorney's fees and expenses incurred in good faith by a bank in saving itself from loss occasioned by the fraud of a party who obtained from it a draft, and then caused the same to be cashed, may be

recovered in an action against the wrong-doer."

■ If time permitted we are sure many examples could be found where reasonable-ness permitted the use of other types of experts—architects, accountants, geologists, engineers—in various other factual situations to reduce a loss. All that is required is that the efforts of the injured party " 'be reasonable under the circumstances of the particular case, his duty being limited by the rules of common sense and fair dealing . . . .' " *Smith-Horton Drilling Co. v. Brooks,* 199 Okl. 63, 182 P.2d 499 (1947), citing 25 C.J.S. Damages § 33 (1966). The question of whether an injured party, acting in good faith, exercised reasonable care and diligence in doing what he did to mitigate damages under a given set of circumstances is a factual question, and, in case of conflicting evidence, is to be resolved by a jury or court sitting without one. *Blake v. Atlas Supply Co.,* 51 Okl. 426, 152 P. 81 (1915).

■ A synthesization of the decisions leads to the conclusion that the scope of the mitigation effort is circumscribed by these factors: (1) it must be in good faith; (2) it must be executed with reasonable skill, prudence, and efficiency; (3) it must be reasonably warranted by and proportioned to the injury and consequences to be averted; and (4) it must be undertaken in a reasonably justified belief that it will avoid or reduce the damage otherwise to be expected from wrongdoing.

■ We hold the allegations made in the amended petition as supplemented in the case at bar are broad enough to encompass these features and therefore state a cause of action for the recovery of reasonable fees for services rendered by both the roof expert and the attorney on behalf of the injured plaintiffs in an effort to mitigate their damages from whichever of the defendants is found to have contributed to the cause of the loss.

The order of dismissal is therefore reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.

NEPTUNE, J., concurs.

BACON, Presiding Judge (specially concurring).

I concur in the analysis of the issues and cases in the majority opinion. It seems to me what this case boils down to is certain parties contracted to have a structure designed and built for a specific purpose. And, because of faulty design, materials or workmanship, the structure undisputably was defective and unsuitable for the specific purpose for which it was built. Through no fault of the injured parties, damages continued until they had to take some positive action. That positive action unquestionably required the services of an expert in the field of this type structure. Inasmuch as many parties' rights and liabilities were involved, to say nothing of the hundreds of thousands of dollars, the services of an attorney were equally required. It seems clear to me for the injured parties *not* to employ the roof expert *and* attorney would be not only a bad business judgment, but may very well subject them to a claim of *failure to mitigate damages.*

Is the injured party entitled to recoup these expenses? As the majority opinion points out the case authority indicates the answer is in the affirmative. Such necessary *mitigation expenses* should not and cannot be compared to *litigation expenses* in the pursuit of a lawsuit. The former exist through no fault of the injured party, whether a lawsuit is filed or not, and have nothing to do with the services rendered for the preparation and trial of a lawsuit, as do the latter.

I would therefore reverse and remand the case to the trial court with directions to overrule the demurrers and proceed accordingly.