**WOMEN'S FEDERAL SAVINGS AND LOAN ASSOCIATION OF CLEVELAND, an Ohio corporation and Federally Chartered Savings and Loan Association, Plaintiff,**

v.

**NEVADA NATIONAL BANK, a Nevada and National Banking corporation, Defendant.**

**No. CV–R–82–360–ECR.**

United States District Court, D. Nevada.

April 19, 1985.

Jack I. McAuliffe, Reno, Nev., for plaintiff.

Gary M. Nelson, Reno, Nev., for defendant.

## MEMORANDUM DECISION AND ORDER

EDWARD C. REED, Jr., District Judge.

The action has been brought by Women's Federal Savings and Loan Association of Cleveland (WOFED) (now known as Women's Federal Savings Bank), plaintiff, against Nevada National Bank (NNB), defendant, for breach of an agreement whereby WOFED and NNB agreed to participate together in making a loan to John and Barbara Cavanaugh (Cavanaughs) in connection with the development of a casino-motel operation known as Gold Dust West (GDW) in Reno, Nevada. WOFED seeks recission of the agreement and damages.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332(a)(1), on the basis that WOFED is an Ohio corporation and that NNB is a Nevada banking corporation.

In 1975 the Cavanaughs acquired the GDW casino-motel property. In late 1976 or early 1977 they were seeking financing for reconstruction of improvements on a portion of the property and construction of new improvements on other parts of it. Through a loan broker they were brought in touch with WOFED, which became interested in making a loan to them. It was WOFED's view that before it would be willing to make such a loan, arrangements would have to be made with a local Nevada bank to participate as a co-lender and to administer the loan. This was felt to be necessary because WOFED was too far removed from Nevada to look after the

administration of the loan and it was unfamiliar with Nevada laws and procedures.

Mr. Cavanaugh was a customer of NNB and made arrangements through Mr. George Aker, a top executive of NNB, for that bank to act as the participating local bank for the loan. Subsequently, an agreement was entered into between WOFED and NNB called a "Loan Participation Agreement" (LPA). According to the LPA, the Cavanaugh loan in the total sum of $2,800,000 was to be made in the name of NNB, but shared to the extent of $2,500,000 by WOFED and $300,000 by NNB. The LPA provides that a participation certificate be issued by NNB to WOFED to evidence the latter's interest in the loan. The LPA also requires NNB to service the loan with respect to such matters as collecting the monthly payments, collecting impound payments on a monthly basis for taxes and insurance, segregating in a separate custodial account funds received that are to be divided between the participating lenders, and providing certain information to WOFED during the repayment period. The security for the loan is the GDW real property.

On July 26, 1977, the loan was closed. WOFED's share of the loan funds was received by NNB and, together with the loan contribution by NNB, disbursed to the Cavanaughs. The first deed of trust, with NNB named as beneficiary, was recorded and in all other respects the loan arrangements concluded. On January 26, 1978, the Cavanaughs obtained an additional loan from NNB in the amount of $1,500,000. This loan was secured by a second deed of trust on the GDW real property, junior to the WOFED–NNB first deed of trust. On June 16, 1980, NNB made an additional $750,000 advance on the second deed of trust. Thereafter, the loans secured by the second deed of trust were renewed each year, until they were satisfied in November of 1982. The first of the loans secured by the NNB second deed of trust was originally at an interest rate of two percent above prime. However, at the time of each annual renewal the interest rate on the loans secured by the second deed of trust was

increased until it reached a level of 22½%. A monthly payment in excess of $66,000 was required to service them. How the proceeds of the loans secured by the second deed of trust were expended is not completely clear, but it appears that from the beginning and up until December 1984 GDW lost substantial sums of money. Its annual losses have ranged between $600,000 and $1,200,000 from 1977 to 1984. In December of 1984 for the first time GDW showed a profit, but overall GDW showed a substantial loss even for the year 1984.

The funds to sustain GDW were largely obtained through contributions by Mr. Cavanaugh and his family to the enterprise. The result of this drain on Mr. Cavanaugh's resources was to substantially diminish his own personal wealth and eventually place him in a position where he was hard pressed to meet the payments on either the first or second deeds of trust. The monthly payments on the first WOFED–NNB first deed of trust were approximately $25,000 and, as mentioned above, the monthly payments on the NNB second deed of trust reached a figure in excess of $66,000.

By 1981 the Cavanaughs were having serious financial difficulties and were endeavoring to liquidate other assets in order to meet GDW's obligations.

The preponderance of the evidence is that until the fall of 1982 WOFED was not advised that NNB had provided the additional financing to the Cavanaughs. While the Cavanaughs were from time to time late in making the payments on the first deed of trust, no serious delinquency occurred until the summer and early fall of 1982. At that time the matter of the Cavanaugh delinquency was brought specifically to the attention of James J. Auletta, Manager of the Loan Service Department of WOFED. The Cavanaughs' first deed of trust was then three monthly payments delinquent. On September 21, 1982, Mr. Auletta contacted Mr. Richard Martucci of NNB and was advised that the Cavanaughs were delinquent not only on the first deed

of trust but also under the second deed of trust, as well as on a lease held by NNB. This was the first time that WOFED learned of the secondary financing that had been provided by NNB to the Cavanaughs.

At a followup telephone conversation the next day with Mr. Martucci and Russell Bowring, head of the Real Estate Department and in charge of real estate lending for NNB, Mr. Auletta learned that NNB had not followed some of the requirements of the Loan Participation Agreement, e.g., no custodial account had been established for receipt of the Cavanaughs' payments on the first deed of trust, and no impound account had been set up for real estate taxes or insurance premiums.

In the course of the telephone conversation, Mr. Martucci and Mr. Bowring also advised Mr. Auletta that NNB had been negotiating with Circus Circus and the Peppermill with a view to the possibility of either one taking over GDW's operation. It was the view of the NNB executives that if the GDW property were closed or the gaming license not renewed (substantial gaming license fees were due during October of 1982 and it appeared that the Cavanaughs did not have the resources to pay them), there would be serious difficulty in reopening the operation within a short period of time. The value of the property would then be greatly reduced.

Arrangements hurriedly were made for Mr. Auletta and Mr. Richard A. Prayson, general counsel to WOFED, to come to Reno to meet with NNB officials concerning the situation and also to meet with representatives of the Peppermill relative to the possibility of their assuming the first deed of trust.

Mr. Auletta and Mr. Prayson arrived in Reno on September 28, 1982, and were taken to GDW. The property appeared to them to be poorly maintained and the employees seemed lacking in motivation. The next day they met with Mr. Martucci, Mr. Bowring and Carl Peters, acting in behalf of NNB. It was confirmed at that time that no custodial account had ever been established and that there were no im-

pound accounts to cover taxes and insurance. The WOFED officials were advised by the representatives of NNB that gaming license fees of up to $100,000 were due at various times commencing with the first of October, 1982. The parties discussed a letter that had just been received from Mr. Cavanaugh requesting that WOFED and NNB forebear from filing notices of default on the obligations due them. The NNB officials strongly urged the WOFED representatives not to proceed with foreclosure, which they believed would place the value of the property in jeopardy, particularly if the business could not be kept open. Additionally, the NNB people pointed out that GDW had the benefit of a grandfather exception to Reno City zoning ordinances which required that casinos and motels be under one roof and not situated in separate buildings as is GDW. If the business were closed, the benefit of the grandfather clause might be lost, and it might not be possible under existing zoning ordinances to reopen the casino.

Appraisals had been obtained indicating the GDW value for a "quick sale" in a range between approximately $4,100,000 and $4,700,000.

The following day a meeting was held with a representative of the Peppermill and as it turned out the Peppermill had no interest in assuming the first deed of trust obligation. A subsequent NNB–WOFED conference, which included Mr. Aker, did not produce a solution which was mutually agreeable to NNB and WOFED.

Instructions were then given by WOFED, in accordance with the LPA, requiring NNB to prepare and file a notice of default on the first deed of trust. An amended notice of default and election to sell was filed on October 1, 1982.

However, the Cavanaughs made up the delinquent installment payments on the first deed of trust and brought it current, within the 35-day period during which defaults on deeds of trust can be cured under Nevada law merely by paying back install-

ments. It also appears that at about this time, the subsequent loans made by NNB also were satisfied completely. Since that time, while there may have been occasional late payments, all payments due have been made on the first deed of trust.

Shortly after the above occurrences, the within action was filed by WOFED. It seeks recission of the loan agreement, a disgorging of the interest received by NNB on its subsequent loans, and damages for expenses incurred by WOFED in seeking to protect its position and collect the sums due it. WOFED also seeks punitive damages. WOFED's theory is that it is entitled to recission of the LPA because NNB breached the LPA by failing to establish a custodial account for receipt of funds on the first deed of trust, failing to establish and maintain an impound account for reserves to pay taxes and insurance, willfully failing to forward to WOFED information concerning the sometimes desperate financial condition of the Cavanaughs and the losses being suffered at GDW, and advancing secondary financing without the knowledge and approval of WOFED.

The damages WOFED claims are in the amount of the cost to WOFED for the time its personnel have spent in seeking to protect its position under the first deed of trust and collecting the sums due it and in pursuing the instant action, loss of income to WOFED due to late payments, cost of air fare accommodations and car rentals for representatives of WOFED to come to Reno to deal with the problems, copies, and finally for attorney's fees and costs which relate to this case. The total damages claimed by WOFED against NNB are in the sum of $63,613.00. WOFED also claims to be entitled to restitution of profits received by NNB on the secondary financing, in the form of interest payments, in the amount of $974,502.68.

The present exact condition of the physical property of GDW is unclear on this record, but appears to be better than that observed by Mr. Auletta and Mr. Prayson when they came to Reno in 1982. The Cavanaughs have been in the process of rehabilitating certain of the motel units and have added additional luxury suites. As noted above, with the exception of the month of December 1984, GDW has continued to lose substantial sums of money. It appears that the Cavanaughs are still having to make sizable contributions to keep the operation going and to make the payments on the first deed of trust. While the Cavanaughs' financial condition may have further deteriorated, their present exact financial condition is uncertain. In the early 1980s it was estimated that the Cavanaughs would go through the remainder of their assets in supporting GDW within a period of between four and seven years. Whether the Cavanaughs will be able to meet the obligations of the first deed of trust as they fall due in the future is conjectural.

WOFED contends that the obligations the Cavanaughs incurred in connection with the secondary financing from NNB contributed in a substantial way to their distress. WOFED also contends that if financial information respecting the Cavanaughs and the GDW operation had been provided on a timely basis, as required by the LPA, WOFED would have been able to take corrective action sooner so that the delinquencies suffered in the fall of 1982 and the present difficult position of the Cavanaughs would not have occurred.

■ The preponderance of the evidence is that NNB did not live up to its obligations under the LPA in the following respects:

1. No custodial account was established nor has one been established even to the present date.

2. No impound account to accumulate reserves for payment of insurance and taxes was or ever has been established in connection with this loan.

3. NNB did not forward to WOFED financial data it received concerning the

deteriorating financial condition of the Cavanaughs and GDW.

The Court further finds that:

(a) NNB made a loan on a second deed of trust on the same property as was the subject of the first deed of trust, and also provided other secondary financing to the Cavanaughs, both without the approval of WOFED.

(b) WOFED has suffered expenses in the amount of $63,613.00, in the prosecution of this action, and in endeavoring to protect itself re the first deed of trust loan.

(c) The ability of the Cavanaughs to continue to meet the obligations of the first deed of trust are uncertain.

(d) The present value of the GDW property is unclear. The latest appraisal on file for a quick (within 90-day) sale is a little more than two years old. It appears to the Court, however, that if a quick sale were attempted, a buyer might or might not be obtained within a 90-day period of time.

While NNB's obligation to establish the custodial account and the impound account for reserve of insurance and taxes and its obligation to provide financial information to WOFED is clear in the LPA, whether NNB violated the LPA by providing the secondary financing is not that clear. This involves an interpretation of Paragraph XIII of the LPA. It specifies that NNB, after first obtaining WOFED's written consent, may make additional advances to the Cavanaughs for taxes and insurance premiums. NNB and WOFED then would participate in the advances in the same proportions as their pro rata share of the original loan secured by the first deed of trust. The last sentence of Paragraph XIII reads: "[NNB] agrees that it will not make additional voluntary advances for purposes other than those specified herein unless authorized to do so by [WOFED] in writing."

Clearly, the subsequent loans by NNB were for purposes other than taxes and insurance premiums. Also, the second deed of trust, dated exactly six months after the first deed of trust, makes no reference to the latter. Both contain boilerplate "dragnet clauses" which state that the deeds of trust secure both present and future indebtedness and obligations of the Cavanaughs to NNB. A May 30, 1980, amendment to the second deed of trust specified that a new loan of $750,000 was secured by the second deed of trust. These facts indicate the intention of NNB and the Cavanaughs that the subsequent loans would be junior to the one secured by the first deed of trust. The intention of the parties is determinative as to the applicability of a "dragnet clause." *Emporia State Bank and Trust Co. v. Mounkes*, 214 Kan. 178, 519 P.2d 618, 621 (1974). The mere existence of such a clause in the security instrument is not sufficient; there must be supporting evidence that demonstrates the parties' intention that the new loan shall be secured by the old deed of trust. *Id.*, 519 P.2d at 623. No such evidence has been presented in this action. In fact, NNB has introduced evidence that its subsequent loans to the Cavanaughs were not advances covered by the first deed of trust. The Court therefore finds that the subsequent loans were not violative of Paragraph XIII of the LPA. NNB may not be required to pay over to WOFED the interest received under the secondary financing.

■ The law of Nevada is controlling in this diversity case, which concerns interests in real property situate in the State. *See Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 734 n. 6 (9th Cir.1980).

NNB contends that its activities and conduct have not impaired the security of WOFED, because the value of the GDW property still exceeds the amount owed to WOFED. The improper handling of taxes and the failure to obtain required prior approval of a lender have been held to create a potential impairment of security, in violation of an agreement. *Ferdie Sievers, Etc. v. Diversified Mortgage Investors*, 95 Nev. 811, 603 P.2d 270, 274 (1979). Further, the Nevada Supreme Court has held that the fact that the amount of debt

remaining is exceeded by the value of the securing property does not prove that there has not been an impairment of security. *First Western Financial v. Vegas Continental*, 100 Nev.Adv.Op. 149, 692 P.2d 1279, 1281 (1984). The *First Western* opinion recognizes that a trust deed holder generally insists on a margin of security over and above the original indebtedness and bargains for that margin to increase over the years. *Id.* A decrease in the ratio of the value of the property securing the debt to the amount of debt remaining constitutes an impairment of security. *Id.* 692 P.2d at 1282. Such a decrease may have occurred here. However, it has not been established that such impairment, if it has happened, has been caused by NNB's conduct. Increased competition and/or a general slowdown in the tourism industry are equally possible reasons.

 As discussed above, the evidence has established breaches by NNB of the LPA with respect to the establishment of custodial and impound accounts and nondisclosure of certain information to WOFED. However, a partial failure of performance of a contract will not suffice as a basis for recission unless it defeats the very object of the contract, or unless the failure concerns a matter of such prime importance that the contract would not have been made if default in that particular had been contemplated. *Havas v. Alger*, 85 Nev. 627, 461 P.2d 857, 862 (1969); *Canepa v. Durham*, 62 Nev. 417, 153 P.2d 899, 903 (1944). The evidence presented in the trial of this action does not establish WOFED's right to recission as a remedy. Restitution per se would not be appropriate because the Cavanaughs, and not NNB, received the consideration provided by WOFED. *See E.H. Boly & Son, Inc. v. Schneider*, 525 F.2d 20, 24 (9th Cir.1975). The Cavanaughs are not defendants herein.

 It is a general rule that no recovery may be had, either in an action based on tort or on contract, for damages the plaintiff could have mitigated by reasonable effort and expenditures. 25 C.J.S. Damages § 33. The steps which the injured party must take to minimize or prevent aggravation of damages are those that a reasonably prudent person would take. *Brown v. Lindsay*, 68 Nev. 196, 228 P.2d 262, 265 (1951). Thus, WOFED did have a duty to mitigate any damages caused by NNB's breach of contract or tortious conduct.

 There is a distinction between costs of litigation and costs of mitigation. *Tulsa Municipal Airport Trust v. Nat'l Gypsum Co.*, 551 P.2d 304, 308 (Okla.App. 1976). Neither costs nor attorney fees incurred incident to litigation may be recovered unless authorized by statute or rule. *Sun Realty v. Eighth Judicial Dist. Ct.*, 91 Nev. 774, 542 P.2d 1072, 1074 (1975). On the other hand, a plaintiff is entitled to recover all legitimate expenses reasonably incurred in an honest endeavor to reduce the damages flowing from the defendant's wrongful acts. *City of Enid v. Crow*, 316 P.2d 834, 837 (Okla.1957). This is true even if the mitigation efforts prove to be unsuccessful. *Tulsa Municipal Airport Trust*, 551 P.2d at 309. The scope of the mitigation effort is limited by the following factors: (1) it must be in good faith; (2) it must be executed with reasonable skill, prudence and efficiency; (3) it must be reasonably warranted by and proportioned to the injury and consequences to be averted; and (4) it must be undertaken in a reasonably justified belief that it will avoid or reduce the damage otherwise to be expected from the defendant's wrongful acts. *Id.* at 311. The September 1982 trip to Reno by WOFED's Mssrs. Auletta and Prayson complied with those four factors. At the time, WOFED reasonably felt that its loan to GDW was in jeopardy and that NNB could not be trusted to act as a fiduciary on WOFED's behalf. Expenses totalling $1636 ($1000 air fare, $336 lodging, $150 meals and $150 car rental) are recoverable by WOFED as costs of mitigation.

█ Attorney fees incurred in mitigation activities also are recoverable as an item of damage. *American Fed. of Musicians v. Reno's Riverside Hotel, Inc.,* 86 Nev. 695, 475 P.2d 220, 222 (1970); *see also City of Las Vegas v. Cragin Industries, Inc.,* 86 Nev. 933, 478 P.2d 585, 590 (1970). So are overhead expenses of the plaintiff, when properly allocated. 3 ALR 3d 689 Anno: Damages-Overhead Expense, at 695 and 704; *see also Geddes & Smith, Inc. v. Saint Paul Mercury Indem. Co.,* 63 Cal.2d 602, 47 Cal.Rptr. 564, 407 P.2d 868, 873 (1965); *Covington Brothers v. Valley Plastering, Inc.,* 93 Nev. 355, 566 P.2d 814, 819 (1977); *Dept. of Water and Power v. United States,* 131 F.Supp. 329, 331–2 (S.D. Cal.1955). The testimony of Mr. Auletta allocated at least three 7½-hour work days of attorney Prayson and himself to their trip to Reno. Mr. Prayson's rate was $80 per hour, for a total of $1800, whereas Mr. Auletta's hourly pay was established at $21.45, for a total of $482.63. The other personnel and overhead expenses of WOFED devoted to mitigation efforts alone were not broken out by the evidence. Therefore, only the $2282.63 proved by the evidence is recoverable here. Adding the $1636 travel expenses to $2282.63 results in a total of $3918.63.

 Punitive damages may be awarded where evidence has shown that a defendant's tortious act was willful and that damage was either intended or a necessary consequence of that act. *Village Development Co. v. Filice,* 90 Nev. 305, 526 P.2d 83, 89 (1974). NNB's activities did not rise to that level. Damages were not intended and with the benefit of hindsight it can be seen that damages to WOFED were not a necessary consequence of NNB's concealment of the financial problems besetting GDW and the Cavanaughs. There has been no showing of ill will or a desire to do harm. *See Bader v. Cerri,* 96 Nev. 352, 609 P.2d 314, 318 (1980). Punitive damages would not be appropriate under the circumstances shown.

 WOFED has asked for attorney fees in connection with this litigation. A federal court is required to apply state law in a diversity action in determining whether to allow attorney fees. *Schulz v. Lamb,* 591 F.2d 1268, 1272 (9th Cir.1978); *Swallow Ranches, Inc. v. Bidart,* 525 F.2d 995, 999 (9th Cir.1975). NRS 18.010(2)(a) authorizes an award of attorney fees to the plaintiff as prevailing party when the plaintiff has not recovered more than $10,000. Here the judgment will be for $3918.63.

It appears that it would be appropriate that any attorneys' fees to be awarded on account of services rendered by plaintiff's attorneys in this case should be made the subject of a separate motion which can deal specifically with that issue in relation to this litigation and the judgment to be entered herein.

This Memorandum Decision and Order shall constitute findings of fact and conclusions of law.

IT IS, THEREFORE, HEREBY ORDERED that the Clerk of Court enter judgment in favor of the plaintiff and against the defendant in the sum of $3918.63, together with costs.