## WOMEN'S FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff/Appellant,

v.

## NEVADA NATIONAL BANK, Defendant/Appellee.

No. 85–2376.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 17, 1986.

Decided March 2, 1987.

---

Jack I. McAuliffe, Reno, Nev., for plaintiff/appellant.

James M. Walsh, Reno, Nev., for defendant/appellee.

Before BROWNING, FLETCHER and NELSON, Circuit Judges.

NELSON, Circuit Judge:

Women's Federal Savings and Loan Association (WOFED) brought this diversity action against Nevada National Bank (NNB), its co-lender, alleging breach of contract and breach of fiduciary duty, and seeking rescission and disgorgement. The district court found that NNB had breached a number of its contractual and fiduciary duties, but concluded that WOFED had failed to show that it had been damaged by those breaches.[1] We conclude that WOFED should not be compelled to stay in this relationship after its fiduciary has proven itself untrustworthy. We therefore reverse.

## BACKGROUND

In 1975 John and Barbara Cavanaugh acquired a casino-motel operation in Reno

---

1. *Women's Fed. Sav. & Loan Ass'n v. Nevada Nat'l Bank,* 607 F.Supp. 1129, 1133–35 (D.Nev. 1985).

known as the Gold Dust West (GDW). In 1976 they contacted WOFED about financing improvements. WOFED was interested in the deal, but insisted that a local Nevada bank participate as co-lender and administer the loan. Mr. Cavanaugh arranged for NNB to fill that role.

WOFED and NNB entered into a "Loan Participation Agreement" ("Agreement"), in which NNB agreed to sell WOFED a 90–percent participation interest in the loan NNB would make to the Cavanaughs to finance the GDW improvements. The Agreement required NNB to: (1) act as a trustee with fiduciary duties toward WOFED in administering and servicing the loan; (2) monitor and periodically investigate the financial condition of the Cavanaughs and the GDW, and inform WOFED promptly of any development that threatened the security of its investment; and (3) establish an impound account for real estate taxes and insurance premiums, and a custodial account for sums due WOFED. The Agreement also provided that any decision about whether to accelerate the loan or declare a default would be made by WOFED.

Pursuant to this agreement, NNB loaned the Cavanaughs $2.8 million, $2.5 million of which had been supplied by WOFED. The loan closed in July 1977. It was secured by a first deed of trust on the GDW real property, with NNB named as the beneficiary. The document included a standard prohibition against junior encumbrances without the beneficiary's consent. The interest rate was 10¼ percent.

In January 1978, without informing WOFED or seeking its consent, NNB loaned the Cavanaughs $1.5 million pursuant to a second deed of trust on the GDW real property. In June 1980, NNB advanced the Cavanaughs an additional $750,-000 on that second deed of trust. The interest rate on these loans was initially set at two points above prime, but NNB raised that rate at each annual renewal until it

reached 22½ percent. The Cavanaughs' monthly payment on the WOFED–NNB loan (pursuant to the first deed of trust) was approximately $25,000, and their monthly payment on the secondary financing provided by NNB (pursuant to the second deed of trust) eventually exceeded $66,000.

The GDW did not prove a profitable venture. It lost between $600,000 and $1.2 million each year between 1977 and 1984. It survived only due to substantial infusions of money by the Cavanaughs. The Cavanaughs experienced serious financial difficulties in 1981 and had to liquidate other assets in order to make the payments due on these loans.

In September 1982 the Cavanaughs were three monthly payments delinquent on the WOFED–NNB loan. This was their first serious delinquency on that loan. WOFED contacted NNB concerning this delinquency and learned for the first time that: (1) the Cavanaughs had been experiencing serious financial difficulties for some time, and NNB had known this and failed to warn WOFED; (2) NNB had approved a junior encumbrance and extended additional loans to the Cavanaughs amounting to $2.25 million without informing WOFED or seeking its consent; and (3) NNB had failed to establish the segregated impound and custodial accounts required by the Agreement.

After considering various plans to salvage the situation, WOFED instructed NNB to file a notice of default on the first deed of trust. The Cavanaughs, however, were able to pay the delinquent installments within the statutory period for curing default,[2] and they have not been seriously delinquent since. WOFED conceded at trial that it had received all the payments that were then due on the loan.

WOFED brought this action asking the court to rescind the Agreement with NNB, thereby freeing WOFED from its involvement in the original loan to the Cava-

---

**2.** At about the same time the Cavanaughs also paid off the January 1978 and June 1980 NNB loans in their entirety.

naughs. WOFED also asked the court to compel NNB to disgorge the profits NNB made by extending the secondary financing to the Cavanaughs in violation of its duty of loyalty to WOFED.

The district court found that NNB had breached its contractual and fiduciary duties toward WOFED by failing to disclose the Cavanaughs' financial difficulties and by failing to establish the custodial and impound accounts. The court explicitly found that WOFED's belief that "NNB could not be trusted to act as a fiduciary in WOFED's behalf" was reasonable. The court concluded, however, that these breaches did not damage WOFED, nor were they serious enough to warrant rescission. The court also concluded that the secondary financing did not constitute a breach of the Agreement, and it accordingly declined to order disgorgement. From these rulings WOFED timely appeals.[3]

*DISCUSSION*

WOFED seeks rescission, arguing that it should not be compelled to remain in a relationship with a fiduciary that has proven itself untrustworthy. NNB contends that it was not really a fiduciary, and that its breaches were not sufficiently serious to warrant rescission. We find NNB's contentions unpersuasive.

■ The contract between WOFED and NNB provided that NNB was to act "as a trustee with fiduciary duties" to protect WOFED's interests. At oral argument counsel for NNB suggested that this language was superfluous, and that it did not impose any enforceable duties on NNB. We believe this suggestion flies in the face of the special concern common law courts have traditionally and consistently exhibited to supervise and enforce fiduciary relationships. *See, e.g., Gold Nugget, Inc. v. Ham*, 95 Nev. 45, 589 P.2d 173 (1979); *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928); 2 A. Scott, *The Law of Trusts* § 170.25 (3d ed. 1967). We therefore reject it. NNB voluntarily en-

tered a contract that called for it to act "as a trustee with fiduciary duties" toward WOFED. It cannot argue now that this language has no meaning.

■ NNB maintains that its breaches were merely technical. Again, we disagree. The record discloses at least four separate breaches of NNB's fiduciary and contractual duties, and none of them are merely technical.

First, the district court found that NNB had breached its contractual and fiduciary duty to establish a custodial account for sums due WOFED and an impound account to accumulate reserves for the payment of insurance and taxes. The duty to segregate and earmark sums held for others was implicit in NNB's fiduciary role. *See Lipic v. Wheeler*, 362 Mo. 499, 508–09, 242 S.W.2d 43, 48 (1951); 2 A. Scott, *The Law of Trusts*, §§ 179.1, 180.2 (3d ed. 1967). In addition, NNB had a specific contractual duty to establish these accounts.

Second, the Agreement imposed on NNB the specific duty to monitor the Cavanaughs' financial condition and to report to WOFED any threats to its interests "with all reasonable promptness." NNB's obligation to keep WOFED informed of any developments that threatened WOFED's interests was also inherent in its role as a trustee. *See Allard v. Pacific National Bank*, 99 Wash.2d 394, 404, 663 P.2d 104, 110 (1983); 2 A. Scott, *The Law of Trusts*, § 173 (3d ed. 1967).

The district court found that NNB had breached these duties by concealing from WOFED the Cavanaughs' serious financial problems. NNB was aware of the Cavanaughs' need for substantial additional funds in January 1978 and June 1980, but it failed to report these facts to WOFED. The Cavanaughs experienced serious financial difficulties in 1981, and NNB again failed to warn WOFED. In the late summer of 1982, NNB was sufficiently concerned about the Cavanaughs' financial sit-

---

**3.** WOFED also challenged the district court's decision to handle by separate motion WOFED's request for an award of attorney fees. We re-
ject that challenge because we conclude that the district court's decision was a proper exercise of its discretion.

uation that it initiated discussions with other casinos, hoping to find somebody willing to take over the GDW operation. Again, NNB failed to alert WOFED to the problem or inform WOFED that it was seeking a buyer.

Third, NNB had a contractual and fiduciary duty to offer WOFED any opportunity that might arise to accelerate the loan. The Agreement explicitly provided that any decision about whether and when to accelerate the loan was to be made exclusively by WOFED. Implicit in that provision was NNB's duty to inform WOFED whenever such an opportunity arose. An opportunity to accelerate the loan did arise in January 1978, when NNB allowed the Cavanaughs to place a junior encumbrance on the GDW property.[4] NNB failed, however, to inform WOFED of this situation, and it failed to give WOFED the opportunity to decide whether it wished to accelerate the loan.[5]

Finally, it is a basic principle of trust law that a fiduciary should refrain from competing in any way with the beneficiary. *See, e.g., Xum Speegle, Inc. v. Fields,* 216 Cal.App.2d 546, 31 Cal.Rptr. 104 (1963) (a corporate director breaches his fiduciary duty when he acquires information about the business and then resigns and uses the information to develop a competing business); *Sauvage v. Gallaway,* 329 Ill.App. 38, 66 N.E.2d 740 (1946) (trustee of a billboard advertising business should be enjoined from operating competing business on his own account); 2 A. Scott, *The Law of Trusts,* § 170.23 (3d ed. 1967). NNB violated this basic fiduciary duty by extending more than $2 million in secondary financing to the Cavanaughs without informing WOFED and seeking its consent.

NNB protests that the secondary financing did not create a conflict of interest,

because NNB's security interest pursuant to the second deed of trust was junior to WOFED's and would not compete with WOFED's in the event of a foreclosure sale. Short of a foreclosure sale, however, there is an obvious conflict of interest present when a cash-poor borrower is obliged to make separate monthly payments to both the beneficiary and the trustee. This is particularly true where, as here, the payment to the trustee is more than twice as large as the payment to the beneficiary.

NNB argues that its various breaches, even when considered cumulatively, are not serious enough to warrant rescission. NNB relies on the following principle of the Nevada law of rescission:

A partial failure of performance of a contract will not give ground for its rescission unless it defeats the very object of the contract or renders that object impossible of attainment, or unless it concerns a matter of such prime importance that the contract would not have been made if default in that particular had been expected or contemplated.

*Havas v. Alger,* 85 Nev. 627, 634–35, 461 P.2d 857, 862 (1969) (citing *Canepa v. Durham,* 62 Nev. 417, 427, 153 P.2d 899, 903 (1944)). NNB contends that its breaches did not completely defeat the object of the contract, because WOFED's primary purpose in entering this loan arrangement was to receive the stipulated principal and interest payments, and those payments have in fact been received.

We reject this contention because we are unwilling to accept NNB's restrictive view of "the object of the contract." WOFED entered the loan arrangement with the Cavanaughs in order to receive

---

**4.** The first deed of trust prohibited the Cavanaughs from further encumbering the GDW property without NNB's consent, and authorized NNB to accelerate the loan if the Cavanaughs violated that prohibition. The Cavanaughs did not violate that prohibition, of course, because NNB consented to the junior encumbrance. The only violation that occurred was that NNB consented to the encumbrance without informing WOFED and obtaining its consent. NNB

thus violated its duty (as imposed in the Agreement) to allow WOFED to make such decisions.

**5.** NNB's duty to offer WOFED acceleration opportunities was distinct from its duty not to compete with WOFED, which we address next. NNB would have had the duty to offer this acceleration opportunity to WOFED regardless of who extended the secondary financing.

the stipulated principal and interest payments, but it entered the Agreement with NNB because it wanted a local trustee to protect the security of its investment. WOFED is based in Ohio, and it was unwilling to loan the Cavanaughs money to improve their Reno casino unless it first found a local bank familiar with Nevada law and willing to participate as a co-lender, administer the loan on a day-to-day basis, and monitor the Cavanaughs' financial condition. WOFED put the fiduciary language in the Agreement because it wanted a knowledgeable and trustworthy local institution monitoring the situation and looking out for its interests. It is precisely in these areas that NNB proved itself untrustworthy. NNB repeatedly and seriously breached contractual and fiduciary duties so central to WOFED's purpose in entering the Agreement that WOFED clearly would not have entered that agreement "if default in that particular had been expected or contemplated." Those breaches therefore warrant rescission.[6]

▮ WOFED also petitions the court to order NNB to disgorge the profits it made on the secondary financing it extended to the Cavanaughs. When a fiduciary's personal interests compete with those of the party to whom the fiduciary duty is owed, creating the risk that the needs of that party may be subordinated to those of the fiduciary, the slighted party may be awarded profits earned in the disloyal activity. *See* G. Bogert, *The Law of Trusts and Trustees* § 543(O) at 340 (rev. 2d ed. 1978); *see also Wilshire Oil Co. v. Riffe*, 381 F.2d 646, 650–52 (10th Cir.), *cert. denied*, 389 U.S. 822, 88 S.Ct. 50, 19 L.Ed.2d 75 (1967); *United States v. Bowen*, 290 F.2d 40, 44 (5th Cir.1961) ("It is the action of undertaking to act in self-interest while compelled to act solely for the master's

interest which subjects the servant to the duty to account.... The master as the party whose trust has been betrayed has the widest relief. He is entitled to all of the fruits of the servant's dereliction."). If the district court finds that, by extending the unauthorized secondary financing, NNB was competing with its fiduciary, WOFED, disgorgement would not be an inappropriate remedy.

This court would not compel WOFED to remain in a relationship with a fiduciary that has proved itself untrustworthy. We therefore reverse the district court's denial of recession. We remand to the district court for reconsideration of the appropriateness of the remedy of disgorgement in light of the principles set forth in this opinion.

REVERSED and REMANDED.

---

6. Equitable relief is appropriate because the enforcement of fiduciary duties is traditionally an equitable function, *see generally* 1 J. Pomeroy, *A Treatise on Equity Jurisprudence* §§ 151, 157 (5th ed. 1941); D. Dobbs, *Remedies* § 2.3 (1973), and because the legal remedy would be inadequate. The trial court found that WOFED has been damaged because its security has been impaired: it is not clear that the Cavanaughs

will continue to meet their obligations on the first deed of trust. This impairment of WOFED's security, however, is not reasonably quantifiable, and the legal remedy is therefore inadequate. *See Derwell Co. v. Apic, Inc.*, 278 A.2d 338, 343 (Del.Ch.1971). Leaving WOFED to its legal remedy might also require WOFED to bring additional lawsuits. *See generally* D. Dobbs, *Remedies* § 2.5, at 57–58 (1973).