See also 673 F.Supp. 401.

WOMEN'S FEDERAL SAVINGS AND LOAN ASSOCIATION OF CLEVELAND, an Ohio corporation and Federally Chartered Savings and Loan Association, Plaintiff,

v.

NEVADA NATIONAL BANK, a Nevada National Banking corporation, and Does I–XX, Defendant.

No. CV–R–82–360–ECR.

United States District Court, D. Nevada.

Oct. 21, 1987.

Jack I. McAuliffe, Reno, Nev., for plaintiff.

Gary M. Nelson and James Walsh, Reno, Nev., for defendant.

### ORDER

EDWARD C. REED, Jr., Chief Judge.

This case is before the Court on remand. *See Women's Federal Sav. and Loan Ass'n v. Nevada Nat'l Bank*, 811 F.2d 1255 (9th Cir.1987), *reversing and remanding, Women's Federal Sav. and Loan Ass'n v. Nevada Nat'l Bank*, 607 F.Supp. 1129 (D.Nev.1985). The factual determination to be made is the amount of profit earned by Nevada National Bank ("NNB") on certain financing extended to John and Barbara Cavanaugh between July, 1977, and November, 1981.

The detailed background of this case may be found in this Court's 1985 Memorandum Decision and Order, published at 607 F.Supp. 1129.

In 1977 NNB entered into a "Loan Participation Agreement" ("LPA") with Women's Federal Savings and Loan Association of Cleveland ("WOFED"), the plaintiff herein. Pursuant to the LPA a loan of $2.8 million was to be made to the Cavanaughs. The loan was to be made in the name of NNB, but shared to the extent of $2.5 million by WOFED. The LPA required NNB to service the loan with respect to such matters as collecting the Cavanaughs' monthly payments, collecting impound payments on a monthly basis for taxes and insurance premiums, segregating in a separate custodial account funds received that were to be divided between the participating lenders, and providing certain information to WOFED during the repayment period. The security for the loan was real property in Reno, Nevada, on which the Cavanaughs developed and operated a casino-motel known as the Gold Dust West.

On July 26, 1977, the loan was closed and the funds were disbursed to the Cavanaughs.

Subsequently, from July, 1977, to November, 1981, NNB extended a series of financing to the Cavanaughs. It is undisputed that the average principal balance for all such "secondary" financing was: $22,603 in 1977; $967,000 in 1978; $1,458,000 in 1979; $1,649,350 in 1980; $1,523,670 in 1981; and $1,467,655 in 1982. Much of the secondary financing was secured by a second deed of trust on the Gold Dust West real property. The parties stipulated to the fact that total interest of $1,105,000 was paid by the Cavanaughs to NNB on the secondary financing before all such debt was discharged on December 2, 1982.

In the fall of 1982, the Cavanaughs became delinquent on the NNB/WOFED loan. It was then that WOFED was first advised that NNB had provided the secondary financing to the Cavanaughs and that the Cavanaughs were delinquent in repaying those loans as well as the NNB/WOFED loan. Also, at that time WOFED learned that NNB had not met some of the requirements of the LPA. For example, NNB had failed to establish a custodial account for receipt of the Cavanaughs' payments and had failed to set up an impound account for real estate taxes and insurance premiums.

Eventually, instructions were given by WOFED, in accordance with the LPA, requiring NNB to prepare and file a notice of default on the first deed of trust on the Gold Dust West property. An amended notice of default and election to sell was filed on October 1, 1982. The Cavanaughs, however, made up the delinquent installment payments on the first deed of trust and brought it current within the 35–day period allowed under Nevada law. Thereafter, the Cavanaughs, though occasionally late, paid all payments due on the NNB/WOFED loan until its discharge.

On November 5, 1982, WOFED filed its complaint in this case. Plaintiff sought rescission of the LPA, disgorgement of profit earned by NNB on the secondary

financing, damages incurred by WOFED in seeking to protect its position and collect sums due it, and punitive damages. WOFED argued that NNB breached the LPA by failing to establish a custodial account for receipt of funds on the first deed of trust, failing to establish and maintain an impound account for reserves to pay taxes and insurance premiums, failing to forward to WOFED information concerning the sometimes desperate financial condition of the Cavanaughs, and advancing the secondary financing without the knowledge and approval of WOFED. The case was tried before the Court from January 14 to 16, 1985. This Court found that NNB breached the LPA by failing to establish a custodial account, by failing to establish and maintain an impound account, and by failing to forward to WOFED certain financial data concerning the Cavanaughs. The Court found that there was no breach in NNB's extension of secondary financing to the Cavanaughs. The Court awarded plaintiff damages of $3,918.63 but denied rescission, disgorgement, and punitive damages. *See Women's Federal Sav. and Loan,* 607 F.Supp. 1129 (D.Nev.1985).

The plaintiff appealed. The Ninth Circuit Court of Appeals found two breaches by NNB beyond those found by this Court. First, the Court of Appeals found that NNB breached the LPA by failing to offer WOFED an opportunity to accelerate the loan. Second, the court found that "NNB violated [a] basic fiduciary duty by extending more than $2 million in secondary financing to the Cavanaughs without informing WOFED and seeking its consent." *Women's Federal Sav. and Loan,* 811 F.2d 1255, 1259 (9th Cir.1987). The Court of Appeals held that the breaches by NNB of the LPA and of its fiduciary duties warranted rescission of the LPA. The court remanded the case to this Court for further proceedings.

This Court has since entered orders effecting rescission of the LPA. WOFED has recovered the principal balance on its participation interest in the NNB/WOFED loan along with the appropriate interest. Further, this Court has determined that, in view of the Court of Appeals' Opinion, dis-

gorgement of profits earned by NNB on the secondary financing is an appropriate remedy.

The issue remaining, then, is the amount of such profits. A hearing was held on this issue on September 8, 1987.

In this diversity action, the Court must apply the substantive law of the forum state, Nevada. *Kabatoff v. Safeco Ins. Co. of America,* 627 F.2d 207, 209 (9th Cir. 1980). The task of this Court is to approximate state law as closely as possible. *Gee v. Tenneco, Inc.,* 615 F.2d 857, 861 (9th Cir.1980). Where Nevada's highest court has not decided an issue, this Court must predict how the state high court would resolve it. *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986). The Court has found no Nevada authority which offers guidance on the equitable remedy of disgorgement of profits.

The Ninth Circuit Court of Appeals, in explaining the disgorgement remedy as it applies to this case said:

> When a fiduciary's personal interests compete with those of the party to whom the fiduciary duty is owed, creating the risk that the needs of that party may be subordinated to those of the fiduciary, the slighted party may be awarded profits earned in the disloyal activity.

*Women's Federal Sav. and Loan,* 811 F.2d 1255, 1260 (9th Cir.1987). The Court of Appeals also stated:

> It is the action of undertaking to act in self-interest while compelled to act solely for the master's interest which subjects the servant to the duty to account.... The master as the party whose trust has been betrayed has the widest relief. He is entitled to all of the fruits of the servant's dereliction.

*Id., quoting, United States v. Bowen,* 290 F.2d 40, 44 (5th Cir.1961).

The disgorgement to be effected in this case, then, is a disgorgement of the "profits" or "fruits" acquired by NNB in extending the secondary financing to the Cavanaughs. The parties disagree on the meaning of these terms.

**408**

The plaintiff adopts the position that it is entitled to the gross interest earned by NNB on the secondary financing. For this proposition WOFED cites language from *Bowen, supra,* and points primarily to securities law cases such as *Whittaker v. Whittaker Corp.,* 639 F.2d 516 (9th Cir. 1981) and *SEC v. Commonwealth Chem. Securities, Inc.,* 574 F.2d 90 (2d Cir.1978). The remedies imposed in those cases were remedies provided for by securities statutes. For example, in *Whittaker* disgorgement was provided for by § 16(b) of the Securities Exchange Act of 1934. Specific law has developed under the securities statutes, and the usefulness of opinions discussing that law in determining the rules of equity that the Nevada Supreme Court would apply in the situation at hand is questionable.

This Court is not persuaded that equitable disgorgement of profits in this case requires disgorgement of gross interest. The generally understood meaning of the word "profit" is the same in the legal community as it is in other disciplines: "the gross proceeds of a business transaction less the costs of the transaction," or "[e]xcess of revenues over expenses for a transaction." Black's Law Dictionary 1090 (5th ed. 1979); *see also* Webster's Third New International Unabridged Dictionary, 1811 (1981) ("the excess of returns over expenditure in a transaction or series of transactions").

The Court finds that the area of law dealing with misappropriation of trade secrets offers a helpful analogy to the situation in this case. In such cases the misappropriation of trade secrets is considered a breach of fiduciary duty as was the extension of secondary financing in the case at bar. The rule in such cases is that net profits earned by way of the breach must be accounted for and turned over to the party owed the fiduciary duty. *See International Indus., Inc. v. Warren Petroleum Corp.,* 248 F.2d 696 (3d Cir.1957); *Reinforced Molding Corp. v. General Electric Co.,* 592 F.Supp. 1083 (W.D.Pa.1984); *Julius Hyman & Co. v. Velsicol Corp.,* 123 Colo. 563, 233 P.2d 977 (1951).

This Court recognizes that the defendant has the burden of accounting for its profits. Any uncertainties as to the amount of profit earned by defendant on the secondary financing must be resolved in favor of WOFED. This is because the information necessary to make the determination of the profit earned is in the hands of the defendant; defendant should not be allowed to benefit from the fact that it can conceal the fruits of its breach. The defendant in this case has carried its burden. NNB has provided the Court with detailed accountings of the profit it earned on the secondary financing.

The gross interest earned by NNB on the secondary financing totalled $1,105,000. The parties stipulated that this was the gross interest earned on all financing combined excluding a June 18, 1980, loan of $750,000 made by NNB to the Cavanaughs.

■ The Court finds that interest paid by the Cavanaughs on the June 18, 1980, loan should not be included in the gross interest earned by NNB on the secondary financing. This is because the June 18, 1980, loan was sold immediately by NNB to Nevada National Leasing ("NNL"). The evidence at the hearing showed that NNL is an entity distinct from NNB. Plaintiff argued that NNL should be considered an alter ego of NNB for the purpose of determining profits. Plaintiff points out that NNB and NNL are subsidiaries of the same holding company and that NNB and NNL have directors and officers in common. These facts, however, do not require the Court to treat NNB and NNL as one. The evidence is that NNL is a separate entity with a separate, legitimate existence. The Court will not treat NNL as an alter ego of NNB. All interest paid by the Cavanaughs on the June 18, 1980, loan was paid to NNL. The gross interest earned by NNB on the secondary financing was unaffected by interest paid on that loan.

In determining the amount of profit earned by NNB on the secondary financing the gross interest earned must be reduced by the cost to NNB of the money loaned.

NNB offered two approaches to the determination of the cost to NNB of the

money loaned. First, it determined the cost of the money loaned to the Cavanaughs assuming that all such money was acquired by borrowing through banking channels. The witness who testified on the cost of funds was Lynwood M. Read, executive vice president of NNB. He referred to money borrowed by NNB through banking channels as "federal funds". Such funds, he said, are the bank's last resort in acquiring money to lend; such funds are also the most expensive of the funds the bank acquires. Read defended the use of the federal fund rate in determining the cost to NNB of money lent to the Cavanaughs by arguing that in the years that NNB lent the Cavanaughs money NNB borrowed an amount of federal funds that was greater than the average principal balance of the Cavanaugh loans. He said that if NNB had not extended the secondary financing to the Cavanaughs, the amount of federal funds that NNB was forced to borrow would have been less by exactly the amount of the Cavanaugh loans.

While this approach is somewhat compelling, it simply does not reflect the true cost of the loans made by NNB to the Cavanaughs. Mr. Read stated that it is impossible to determine exactly where the money lent to the Cavanaughs was obtained by NNB. Banks such as NNB cannot practically keep records allowing such distinctions to be made. The money lent by NNB to the Cavanaughs came from a pool of funds obtained by NNB from a variety of sources. The most accurate way of determining the cost of the Cavanaugh loans is to average the cost of money to NNB for specific periods of time and apply those average costs to the average balances of the loans made to the Cavanaughs during those periods. NNB provided the Court with such calculations. *See* Appendix II. In this way the Court determines that the cost to NNB of funds lent to the Cavanaughs was $637,000. This amount is subtracted from the gross interest income. *See* Appendix I.

The plaintiff points to the June 18, 1980, loan, the loan made to the Cavanaughs by NNB but immediately sold by NNB to

NNL, and argues that the terms of the loan required compensating balances totalling $100,000 to be maintained at NNB by the Cavanaughs. Plaintiff argues that this term reduced the cost of the Cavanaugh money to NNB. The evidence of the $100,-000 compensating balance is a line on the June 18, 1980, loan papers indicating that $100,000 of the $750,000 loan was to be so used. The evidence presented at the hearing, however, especially the testimony of Mr. Read, indicated that the compensating balance was not actually maintained at NNB. Thus, there was no effect on the cost of money to NNB as a result of that provision.

Next, it is necessary to look at certain property transactions in determining the expenses that affected the profits earned by NNB on the secondary financing. This is so because NNB accepted real property in satisfaction of certain of the Cavanaugh obligations. The evidence is that the property was held by NNB for some time before it could be sold. In holding the property for sale, NNB encountered expenses of $160,000; this fact was established by the testimony of Mr. Read. The $160,000 in holding costs is subtracted from the interest earned by NNB. *See* Appendix I.

When NNB sold the real property acquired in satisfaction of the Cavanaugh obligations, the property sold for $26,000 less than the amount of those obligations. In this way, NNB suffered a loss of $26,-000 which must be considered in calculating the profit earned by NNB. *See* Appendix I.

Mr. Read testified that NNB was required to take back certain of the properties sold. NNB argues that this led to additional losses of $215,000. The Court finds that such losses are too remote from the financing extended to the Cavanaughs and cannot reasonably be considered a cost thereof. The point at which costs become so remote from a transaction that they can no longer be considered costs of the transaction cannot be determined exactly. The determination here, concerning NNB's $215,000 loss, is difficult. The Court re-

solves the question in favor of WOFED, to which NNB owed fiduciary duties.

■ The next consideration in calculating NNB's profits is NNB's overhead. The parties disagree on whether NNB's overhead should be taken into account in these calculations. The law is that the "profit" earned on the wrongful transaction must be accounted for and disgorged. The Court finds that NNB's overhead expenses are directly related to its ability to enter transactions such as the extension of the secondary financing to the Cavanaughs. The profit earned by NNB by way of the secondary financing may be calculated only if overhead expenses which are fairly attributable to that financing are considered.

The Court finds that NNB has sufficiently shown a relationship between overhead costs amounting to $201,000 and the transactions here at issue. This NNB has done by comparing its non-interest expenses for the years 1978–1982 to its average assets for the same years; the comparison was expressed as a percentage, 5.11%. Then NNB took that percentage of the average balances on the Cavanaugh loans for the same years. These were added to obtain a total overhead cost attributed to the Cavanaugh loans of $361,057. The $160,000 in property holding expenses already considered are a non-interest expense and should not be considered twice. Therefore, $160,000 was subtracted from the $361,057 figure to obtain an allocated overhead cost of $201,000. *See* Appendix III. This is not represented to be the only, or a 100% accurate, method of determining the overhead attributable to certain loans extended by a bank. The Court does find, however, that

NNB has met its burden of showing the overhead costs of the financing extended to the Cavanaughs. $201,000 is, therefore, subtracted from the interest earned by NNB. *See* Appendix I.

The above calculations ($1,105,000 minus 637,000 minus 160,000 minus 26,000 minus 201,000) yield a profit figure of $81,000. The final step is the subtraction of the income tax paid by NNB on that amount. *See Julius Hyman & Co. v. Velsicol Corp.*, 123 Colo. 563, 233 P.2d 977, 1010–11 (1951). Defendant asserts that the tax on the $81,000 was $37,000; this figure is not disputed by plaintiff. This figure is subtracted from the interest earned by NNB to arrive at a net profit on the Cavanaugh secondary financing of $44,000. *See* Appendix I.

IT IS, THEREFORE, HEREBY ORDERED that defendant Nevada National Bank shall pay to plaintiff Women's Federal Savings and Loan Association of Cleveland $44,000.00. This amount represents profits earned by Nevada National Bank on secondary financing extended to the Cavanaughs.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment accordingly.

### APPENDIX I

### CALCULATION OF PROFIT

#### (In Thousands)

| | |
|---|---|
| Interest Income | $1,105 |
| Cost of Funds | (637) |
| Property Holding Expenses | (160) |
| Loss on Sale of Property | (26) |
| Overhead | (201) |
| Profit Before Income Taxes | 81 |
| Applicable Income Taxes | (37) |
| Net Profit | $ 44 |

### APPENDIX II
### COST OF FUNDS

#### AVERAGE COST OF FUNDS

| Year | NNB's Total Interest Bearing Funding Sources | Reserve Requirement | Net | NNB's Interest Costs | Average Cost |
|---|---|---|---|---|---|
| 1977 | $ 182,431,000 | $4,877,100 | $177,553,900 | $ 9,812,537 | 5.53% |
| 1978 | 217,751,000 | 5,648,130 | 212,102,807 | 14,004,007 | 6.60% |
| 1979 | 268,403,000 | 7,011,450 | 261,391,550 | 21,341,632 | 8.16% |
| 1980 | 278,809,000 | 7,314,300 | 271,494,700 | 25,777,520 | 9.49% |
| 1981 | 286,399,000 | 7,651,530 | 278,747,470 | 30,507,467 | 10.94% |
| 1982 | 331,870,000 | 9,155,010 | 322,714,990 | 31,891,518 | 9.88% |

COST OF CAVANAUGH FUNDS

| Year | Average Loan Balance | Number of Days | Average Cost | Cost of Funds |
|------|---------------------|----------------|--------------|---------------|
| 1977 | $ 750,000 | 11 | 5.53% | $ 1,250 |
| 1978 | 967,000 | 365 | 6.60% | 63,822 |
| 1979 | 1,458,000 | 365 | 8.16% | 118,973 |
| 1980 | 1,649,350 | 365 | 9.49% | 156,523 |
| 1981 | 1,523,670 | 365 | 10.94% | 166,689 |
| 1982 | 1,467,655 | 327 | 9.88% | · 129,907 |
| | | | Total Cost of Funds | $ 637,164 |

## APPENDIX III
## OVERHEAD

| Year | NNB's Average Assets | | Non–Interest Expenses |
|------|---------------------|---|----------------------|
| 1978 | $ 392,158,000 | | $ 16,224,215 |
| 1979 | 481,368,000 | | 21,025,965 |
| 1980 | 501,135,000 | | 25,392,428 |
| 1981 | 506,714,000 | (estimated) | 29,151,919 |
| 1982 | 526,619,000 | | 31,259,057 |
| Total | $2,407,994,000 | | $123,053,584 |

$$\frac{123,053,584}{2,407,994,000} = 5.11\%$$

| Year | Average Loan Balance | Number of Days | Applicable Percentage | Allocated Overhead |
|------|---------------------|----------------|----------------------|--------------------|
| 1978 | $ 967,000 | 365 | 5.11% | $ 49,414 |
| 1979 | 1,458,000 | 365 | 5.11% | 74,504 |
| 1980 | 1,649,350 | 365 | 5.11% | 84,282 |
| 1981 | 1,523,670 | 365 | 5.11% | 77,860 |
| 1982 | 1,467,655 | 327 | 5.11% | 74,997 |
| | Total | | | $361,057 |
| | Property Holding Expenses | | | (160,000) |
| | Allocated Overhead | | | $201,057 |